UNITED STATES of America,
Plaintiff-Appellee,

v.

Donald S. COOPER et al., Defendants-
Appellants.

Nos. 71-1168 to 71-1172.

United States Court of Appeals,
Tenth Circuit.

July 12, 1972.

Rehearing Denied Aug. 25, 1972.

Carl L. Harthun, Denver, Colo. (Robert L. Pitler, Denver, Colo., on the brief), for defendant-appellant Donald S. Cooper.

Charles S. Vigil, Denver, Colo. (Francis R. Salazar, pro se, on the brief), for defendant-appellant Francis R. Salazar.

James W. Creamer, Denver, Colo. (Thomas J. Mitchell, Denver, Colo., on the brief), for defendant-appellant Paul E. Cooper.

Harold L. Davison, Aurora, Colo., for defendant-appellant Delmar E. Cooper.

Shirley P. Jones, Jr., Salt Lake City, Utah (James J. Morrato, Denver, Colo., on the brief), for defendant-appellant George I. Norman, Jr.

Milton C. Branch, Asst. U. S. Atty. (James L. Treece, U. S. Atty., on the brief), Denver, Colo., for plaintiff-appellee.

Before BREITENSTEIN, HILL and McWILLIAMS, Circuit Judges.

HILL, Circuit Judge.

These are direct appeals from convictions of Donald, Delmar and Paul Cooper and Francis Salazar, as principals, and of George Norman, as aider and abettor for alleged misapplication of moneys of a statutorily defined insured bank in violation of 18 U.S.C. § 656 and § 2.

Twelve counts of the thirteen count indictment returned by the grand jury charged various of the appellants of separate transactions, each constituting a misapplication or embezzlement of funds

of the insured bank. The first count of that indictment charged all the appellants with conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371 and listed twelve transactions constituting eleven of the substantive counts as overt acts of the conspiracy. Five of the substantive counts were otherwise disposed of by dismissal or severance and were not considered by the jury. Of the remaining counts, guilty verdicts were returned under count one, the conspiracy charge, against Delmar and Donald Cooper and Salazar; against all three of the Coopers and Salazar on count five; and against Delmar and Donald Cooper and George Norman on counts eight and nine.

The Coopers and Salazar were officers and directors of the Rocky Mountain Bank at Lakewood, Colorado, the "insured bank" through which the alleged misapplication was committed. The scheme allegedly used involved the securing of borrowers by the Coopers and Salazar who would apply for loans from the Rocky Mountain Bank. The loan application would be presented to and approved by the Loan and Discount Committee of the bank, the membership of which was partially comprised of various of the Coopers and Salazar. The loan proceeds were then paid the borrower by Donald or Delmar Cooper acting as an officer of the bank. The borrower would endorse the loan proceeds check and return it, usually to either Donald or Delmar Cooper. This money was then used for the private investment purposes of the Coopers and Salazar.

The charge against Norman is substantially similar with the exception that he was never an officer, director, employee or otherwise connected with the Rocky Mountain Bank. It is the government's contention that Norman, like the Coopers and Salazar, secured people who would apply for loans from the Rocky Mountain Bank, and after approval and payment of the loan proceeds would deliver the money to Norman for use by him in his own business ventures. The link connecting Norman as an aider and abettor and co-conspirator is supplied, according to the contention of the government, by the appearance of Donald and Delmar Cooper as officers of one of the business interests of Norman. The government also contends part of the proceeds of the loans made in connection with Norman were used by Donald and Delmar Cooper to acquire an interest in one of the Norman enterprises.

These schemes, according to the government, faltered when certain of the loans were reviewed by federal banking officials. It was apparently thought by appellants that scrutiny could be avoided by removing these loans from their status in the bank as outstanding loans. To accomplish this, the Denver Revival Tabernacle, a Cooper owned establishment, was transferred to the Rocky Mountain Bank in exchange for certain of the suspect loans. The government contends the value assigned the Tabernacle property in the exchange transaction was grossly overvalued, thereby causing a great financial loss on the loans by the exchange transaction.

Each of the appellants questions the sufficiency of evidence to sustain his conviction. A synopsis of the evidence adduced on each count on which convictions were ultimately returned is dispositive. Count five of the indictment charged that the three Coopers and Salazar, as officers and/or directors of the bank, made a $65,000 loan to Harvey Alpert and Michael Cooper which was used for the benefit of the Coopers and Salazar. Alpert testified that he and Michael Cooper obtained the loan, together with a note from Donald and Delmar Cooper guaranteeing repayment. He testified they delivered the loan proceeds to Donald and Delmar Cooper and were told the money was to be used to pay an obligation owed by them at another bank. He testified there were renewal notes made on the loan and that neither he nor Alpert had ever made any payments on the loan. He also testified that at the time of the original loan he

knew the loan proceeds were to go to Donald and Delmar Cooper.

A summarization of the transaction was given by an F.B.I. agent on the basis of his analysis of bank records and accounting entries. He testified the $65,000 loan proceeds were disbursed on February 17, 1966, by a Rocky Mountain Bank cashier's check signed by Donald Cooper. After endorsement by Alpert and Michael Cooper, the check was deposited to the trust account of Salazar at another bank on the same day. On February 21, 1966, a check dated February 17, 1966, payable to Denver Revival Tabernacle for $55,000, was charged against Salazar's trust account. This check was endorsed by Delmar Cooper and used together with a $3,775.18 Rocky Mountain Bank cashier's check issued February 17, 1966, payable to Donald Cooper, to purchase a Rocky Mountain Bank cashier's check on February 18, 1966, for $58,775.18 payable to Donald Cooper. The Denver Revival Tabernacle account received $55,938.76 from this cashier's check, and the remainder was returned to Donald Cooper by a $2,836.42 Rocky Mountain Bank cashier's check. Prior to the deposit of $55,938.76, the account ledger for the Tabernacle showed an overdraft of $182.-39. On the same day this deposit was made, a $55,754.37 check to American National Bank was charged against the account. This check was a payment in full on a loan of the Tabernacle at that bank.

Repayment of the $65,000 loan to Alpert and Michael Cooper was also included in the F.B.I. agent's summarization. The first payment was a $5,000 Westland Industrial Bank cashier's check drawn on the Rocky Mountain Bank account and was charged to payment of interest on the loan. On March 3, 1967, the loan balance was paid off by a $56,-633 check drawn on Paul Cooper's account at Rocky Mountain Bank payable to that bank. There was also a renewal of $5,000 of the principal on the original loan on March 3, 1967. Payments on the renewal loan were made reducing the balance to $3,000 when it was renewed again. The balance of this renewal on January 30, 1969, when the liquidator for the bank took control of the bank, remained at $3,000. This was subsequently paid in full by Donald Cooper's attorney.

The agent's summarization further disclosed the source of funds for the $56,633 payment by Paul Cooper on March 3, 1967, was a loan made by the Rocky Mountain Bank for that same amount on March 2, 1967. This loan was subsequently renewed and the proceeds used to pay the original loan. Ten payments were made leaving the loan balance on December 24, 1968 at $56,028.06 plus $303.45 interest. The balance of this loan was then included and paid in full in the transfer of the Denver Revival Tabernacle property to the Rocky Mountain Bank.

The conspiracy count alleged twelve overt acts, the same acts charged in eleven of the substantive counts. A detailed narrative is unnecessary other than to say the evidence disclosed transactions similar to that detailed previously; that is, borrowers would be secured and loans made with the loan proceeds being delivered to various of the appellants. Transactions were also alleged in which loans were made to allow purchase of a business enterprise by some of the appellants, then loans were made directly to that business.

■ Violation of 18 U.S.C. § 656 is distinctly limited as to "the class of persons who can violate its provisions, i.e., officers, directors, agents, employees, etc." United States v. Tornabene, 222 F.2d 875, 877 (3d Cir.1955). The evidence adduced at trial clearly shows that the three Coopers and Salazar were definitely within that class. The offense of "misapplication occurs when an officer of a bank knowingly lends money to a fictitious borrower or causes the loan to be made to his own benefit, concealing his interest from the bank." United States v. Fortunato, 402 F.2d 79, 81 (2d Cir.1968), cert. denied, 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463. There was

ample evidence to support the jury's conclusion that the Coopers and Salazar were receiving the benefits of loans without disclosing this fact. There was also ample evidence to support the conclusion that Donald and Delmar Cooper and Salazar acted in concert in committing the offenses. The convictions returned under counts one and five do not fail for lack of proof.

We now turn to the questioned sufficiency of evidence on the verdicts returned under counts eight and nine charging Donald and Delmar Cooper with misapplication and George Norman with aiding and abetting the misapplication in violation of 18 U.S.C. § 2. The two counts charged that two $81,000 loans, one to a Mr. Cloyd Wangsgard and one to Lakewood Medical Center, were made to borrowers secured by Norman and the proceeds used by Norman in his own business enterprises, and also were used by the two Cooper brothers to acquire an interest in one of Norman's businesses. The evidence establishes that the proceeds of the loans were deposited to the Lakewood Medical Center account at the Rocky Mountain Bank on February 23, 1967. Two checks were written on that account on the same day. The first was a check for $37,100 payable to Greater Leasing Company. The second check was for $124,459.21 payable to Rocky Mountain Bank. Evidence, consisting of an application for assignment and transfer of a radio station license, clearly establishes that Donald and Delmar Cooper were directors of Greater Leasing Company on October 5, 1966, each owning 37.5% of the stock. The evidence further reveals the $37,100 deposit was the source of funds for two checks to pay loans charged in counts 6 and 7 which had been previously obtained by Jensen. A check for $28,179.68 to Rocky Mountain Bank was used to pay off the $28,000 balance of a $35,000 loan. The $35,000 loan was a renewal of a prior $25,000 loan made by Jensen at Norman's request as an accommodation for Salazar. A $7,056.73 check was used to pay off a $7,000 loan obtained by Jensen from Westland Industrial Bank. The proceeds of that loan had been paid to Jensen by a Westland Industrial Bank check signed by Donald Cooper. This check was then deposited by Jensen in his personal account in a Golden, Colorado, bank. At the same time Jensen made a check payable to Rocky Mountain Bank for $7,000. This check had been used as a payment on the $35,000 loan, reducing that loan to $28,000. The $124,459.21 check, after being shunted through a complicated series of transactions, ultimately went to either Norman or his wife.

The aider and abettor may violate the statute by assisting a bank official in committing the misapplication.[1] Additionally, it must be shown the misapplication was for the benefit of the bank officer or the aider and abettor.[2] The evidence clearly establishes that the loans made to the borrowers secured by Norman were made in part for the benefit of the Coopers. The fact that Norman was not the named borrower in each of the loans does not serve to insulate him. The evidence discloses the active solicitation and securing of borrowers by Norman and renders the ultimate borrowers to be in reality Norman's alter-ego acting at his direction. Viewing the evidence in the light most favorable to the government, we cannot conclude the jury was unjustified in its guilty verdicts under counts 8 and 9.[3]

Appellants raise a multitude of other arguments, many of which are asserted by all. The first argument is that 18 U.S.C. § 656 is unconstitutionally vague and uncertain in its use

---

1. "Essential to the crime of aiding and abetting a bank official in violating Section 656 is the guilt of the bank official." United States v. Tornabene, 222 F.2d 875, 878 (3d Cir. 1955).

2. *See* Hall v. United States, 286 F.2d 676 (5th Cir. 1960), cert. denied, 366 U.S. 910, 81 S.Ct. 1087, 6 L.Ed.2d 236.

3. United States v. Miller, 460 F.2d 582 (10th Cir. 1972).

of the term "willfully misapplies" which has no commonly accepted definition. In this context, they assert the statute punishes acts which are not clearly defined as violative of the statute. In United States v. Archambault, 441 F.2d 281 (10th Cir. 1971), cert. denied, 404 U.S. 843, 92 S.Ct. 140, 30 L.Ed.2d 78, we dealt with the adequacy of the term "misapply", stating at 283, " '[T]he statutory concept of misapplication is not a vague word of such uncertain application as to require a dismissal of the indictment.' " [4] We do not find the term so vague as to be constitutionally impermissible.

Appellants next assert errors relative to the indictment and the grand jury proceeding. They first claim prejudicial error in the failure to record the grand jury proceedings. We have recently held the failure to record grand jury proceedings is not error.[5]

It is next asserted the presence of the Assistant United States Attorney vitiates the aura of the grand jury as an independent body standing between the governmental prosecutory function and the citizenry. In this context it is asserted this is violative of Fifth Amendment protections. We cannot agree. F.R.Crim.P. Rule 6(d) specifically provides for the presence of attorneys for the government at grand jury proceedings. Indeed, the government attorney is essential to the fact presentation process by which the grand jury reaches its ultimate decision. Presentation of evidence for the grand jury's consideration is not in contravention of Fifth Amendment due process guarantees.

In a somewhat similar vein, it is asserted the presentation of matters to the grand jury by the United States Attorney or his assistant is in excess of statutorily authorized powers thereby rendering the indictment fatally defective. We have previously stated the government attorney is essential to the grand jury process and do not find error in the presentation of matters to the grand jury by the United States Attorney.[6]

It is also asserted the grand jury investigation was improperly conducted in that both the indictment and the superseding indictment were drafted and presented to the grand jury prior to its investigation. Citing Gaither v. United States, 134 U.S.App.D.C. 154, 413 F.2d 1061, 1069 (1969), appellant Salazar maintains the "indictment is preceded by a grand jury investigation, at the close of which the grand jury votes to indict. The prosecutor then drafts an indictment." Gaither dealt not with the mechanics of the grand jury proceeding, but rather the validity of an indictment drawn by the United States Attorney following the grand jury presentment which was signed by the grand jury foreman without submitting it to the remaining members of the grand jury. That decision dealt with the detrimental effect of an indictment which had been redrafted, altered or amended without prior resubmission and approval by the body of the grand jury. We find no error here in the preparation of the indictment before the grand jury's investigation as that body remains free to accept or reject all or any portion of the indictment it chooses.[7] In the grand jury process, one of the important essentials is the agreement of the requisite members of the grand jury before prosecution can be commenced.

---

4. United States v. Fortunato, 402 F.2d 79, (2d Cir. 1968) cert. denied, 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463.

5. United States v. Hedges, 458 F.2d 188, (10th Cir. 1972).

6. *See* Application of United Electrical, Radio & Mach. Workers of Am., et al., 111 F.Supp. 858 (S.D.N.Y.1953); United States v. Smyth, 104 F.Supp. 283 (N.D. Cal.1952).

7. "It is common knowledge, to those who are familiar with the practice, that the District Attorney, or someone in his office, in a large percentage of cases, prepares the indictment, based upon information . . . which is subsequently submitted to, and if accepted by the grand jury as being supported by the facts, becomes the formal indictment." United States v. Brumfield, 85 F.Supp. 696, 704 (W.D.La.1949).

■ There is next raised an assertion that the superseding indictment under which the convictions were returned is fatally defective and a denial of due process guarantees in that no evidence in addition to that presented in the original indictment proceeding was presented at the superseding indictment proceeding. We held in Eidson v. United States, 272 F.2d 684 (10th Cir.1959), that "[t]he grand jury having heard the witnesses once, it was not essential to the validity of the second indictment that they be recalled and give in the form of repetition the evidence previously given before the same grand jury. It was well within the province of the grand jury to return the second indictment without recalling the witnesses and hearing them anew." [8] The record before us indicates it was the same grand jury that returned both indictments; we therefore find no fatal defect in the superseding indictment.

■ Next, there are direct attacks by two of the appellants against the language employed in the superseding indictment. Appellant Donald Cooper contends the language of the first count charging misapplication of "funds or credits" is a duplicitous charge which fails to clearly inform him of whether he stands charged with misapplication of funds or misapplication of credits. This count of the indictment charges the single offense of conspiracy and is not duplicitous in its inclusion of two modes of misapplication under the statute.[9]

It is also asserted the indictment is defective as being generally vague and ambiguous, failing to charge any offense, and being insufficiently informative of the charges to be faced by them. We have repeatedly held the test of sufficiency of the indictment is that "it contains 'the elements of offense intend-ed to be charged and must be sufficient to apprise the accused of the nature of the offense so that he may adequately prepare a defense.'" United States v. Mason, 440 F.2d 1293 (10th Cir.1971), cert. denied, Edwards v. United States, 404 U.S. 883, 92 S.Ct. 219, 30 L.Ed.2d 165. The indictment here meets that test.

■ Donald Cooper next asserts error in the trial court's refusal of his motion for a bill of particulars. Granting or denying motions for bills of particulars is at the discretion of the court, and denial of such motion will not be disturbed on appeal unless that discretion was abused thereby denying the accused information more specifically defining the offense charged against him. United States v. Gleeson, 411 F.2d 1091 (10th Cir.1969). We find no error in the trial court's denial of the motion.

■ Appellants next raise arguments relative to various areas of improper and prejudicial joinder. The first improper joinder asserted is that of including the conspiracy charge and the separate substantive offenses together in the indictment. It is a general rule that "a conspiracy count may properly be joined with substantive counts where it is alleged and shown that the offenses are of the same or similar character and are based upon two or more acts or transactions connected together or constituting parts of a common scheme or plan." Miller v. United States, 410 F.2d 1290 (8th Cir.1969), cert. denied, 396 U.S. 830, 90 S.Ct. 81, 24 L.Ed.2d 80. Inclusion in the indictment of the conspiracy count and the separate substantive counts was not improper under F.R.Crim.P. Rule 8(a).[10]

■ There are next asserted allegations of misjoinder of defendants under F.R.Crim.P. Rule 8(b). In this context

8. *See also* United States v. James, 290 F.2d 866 (5th Cir. 1961), cert. denied, 368 U.S. 834, 82 S.Ct. 60, 7 L.Ed.2d 36.

9. Mulloney v. United States, 79 F.2d 566 (1st Cir. 1935), cert. denied, 296 U.S. 658, 56 S.Ct. 383, 80 L.Ed. 468.

10. *See* United States v. Scoblick, 225 F.2d 779 (3d Cir. 1955).

it is urged the separate counts of the indictment did not name all the charged defendants, nor was there incorporation of individual counts with the remaining counts. The appellants contend the indictment charges various combinations of individuals with crimes committed in separate transactions without incorporating these separate charges into each other. In United States v. Jorgenson, 451 F.2d 516 (10th Cir.1971), cert. denied, 405 U.S. 922, 92 S.Ct. 959, 30 L. Ed.2d 793, we held that joinder was proper where all the co-conspirators were familiar with the modus operandi of the fraudulent scheme even though all the co-conspirators were not present at each charged transaction.[11] There was sufficient evidence that the appellants were joint participants in the same act or transaction or series of acts or transactions to warrant their joint indictment. Refusal to sever was not reversible error.

█ It is also asserted the inherent prejudice to all the co-conspirators required severance under F.R.Crim.P. Rule 14. In Jorgenson we held the onus of showing prejudice under Rule 14 is on the movant and the granting or denial of the motion is within the trial court's discretion. We find no abuse of that discretion, therefore we do not conclude there was improper joinder under Rule 14.

█ Donald Cooper next maintains that in the absence of severance from Salazar, a continuance should have been granted due to a highly publicized search of the building housing Salazar's offices, the arrest of certain individuals, including Salazar's daughter, for narcotics violations, and a suit filed by Salazar in response to the search and arrests, all of which occurred within the week preceding commencement of this trial. The prejudicial publicity argument presents two interesting variations from the usual situation presented in a contention of this sort. First, the subject of the

publicity is not lodging the complaint, but rather a co-defendant; secondly, the publicity is completely unrelated by way of subject matter to the upcoming trial, and is only an event which the news media felt worthy of some exposure. We held in Dennis v. United States, 302 F. 2d 5, 8 (10th Cir.1962), cert. denied, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973, that "the mere fact of unfavorable publicity does not of itself raise a presumption of prejudice. . . . The prejudice must have manifested itself so as to corrupt due process." On this basis we do not find error in the trial court's denial of the motion for continuance.

█ Donald Cooper next asserts he was deprived of his right to a fair trial through the prohibition imposed by the trial court precluding him from making reference to a prior conviction of the co-defendant Norman. Cooper maintains this prohibition prevented him from testifying effectively as to the reasons for his actions and to further show his intent. We recently dealt with the rule providing for reception of evidence of other crimes in United States v. Burkhart, 458 F.2d 201 (10th Cir.1972). The opinion there dealt extensively with the rule itself, its purpose and the inherent prejudice to one accused against whom such evidence is admitted. Nowhere in that rule do we see a blanket allowance of such evidence if presented by a co-defendant. This type of evidence, once admitted, from whatever source, is equally prejudicial to the accused. The trial judge's admonition here went only to disclosure of Norman's conviction. There was no restriction imposed precluding testimony relating to the transaction. This reflects a judicious limitation imposed by the trial court and we find no error in that limitation.

█ Appellant Donald Cooper next argues a determination made by the trial court in front of the jury was both prejudicial and an invasion of the

---

11. *See* United States v. Hickey, 360 F.2d 127 (7th Cir. 1966), cert. denied, 385 U.S. 928, 87 S.Ct. 284, 17 L.Ed.2d 210.

jury function. The situation arose when Donald Cooper's attorney objected to a witness' testimony, concerning statements made to the witness by Salazar, as inadmissible hearsay as to Donald Cooper. The trial court overruled the objection stating, "[T]here is evidence tying your client into count 1, the conspiracy. Once the conspiracy has been formed, hearsay is admissible." We held in Dennis v. United States, 346 F. 2d 10, 15 (10th Cir.1965), rev'd on other grounds, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973, that "incriminating statements made by one co-conspirator during the pendency and in furtherance of a conspiracy are admissable as an exception to the hearsay rule once a conspiracy has been shown." The existence of the conspiracy was sufficiently established by independent evidence[12] to warrant the allowance of this evidence, and such determination did not invade the jury function. Appellant also maintains the court prejudicially affected the weight of evidence by its characterization that items of evidence would be admitted "against" certain of the defendants. We do not feel the use of the word "against" is improper as emphasizing the evidence confronting the accused.

Error is next asserted relative to the trial court's instructions. Appellants maintain that certain of the instructions were improper and further that the trial court erred in refusing to give certain instructions tendered by the defendants. The instructions given, when considered as a whole adequately explained the applicable law.[13]

■ Error is next predicated by appellants Donald Cooper and Salazar with respect to evidentiary matters. Salazar contends it was error to allow the jury to consider evidence relative to count two when he was not named in that count in the indictment and a mistrial was granted as to the only named defendant. The evidence relative to count two was relevant both to proof of the substantive offense and the conspiracy. The offense charged in count five was also charged as an overt act of the conspiracy. The evidence was properly received against Salazar in context of the conspiracy.

■ Evidence relative to three counts was received by the court then subsequently rejected and the counts dismissed or severed. The trial court instructed the jury to disregard this evidence in its deliberations. Donald Cooper asserts this evidence, once presented, denied him a fair and impartial trial. His contention is that it was a physical impossibility for the jury to disregard this evidence in its deliberations. It is presumed the jurors observed the instructions of the court and speculation that this was not done may not be employed in assailing their verdict.[14]

■ Two matters relative to the presentation of evidence to the jury are further raised as reversible error. Appellants first object to the summarization of the extensive bank records, accounting machine tapes, debit and credit slips and loan papers by the F.B.I. agent. They contend this is not a proper case for the use of a summary witness. We have long held that "a qualified expert may examine voluminous or intricate books and records and for the convenience of the court and jury give a summary of their contents . . . ." Hartford Acc. & Indem. Co. v. Collins-Dietz-Morris Co., 80 F.2d 441 (10th Cir.1935). The use of the summary witness was proper in aiding the understanding of the evidence presented.

Error is also asserted relative to the delivery to the jury by the trial court of a list of exhibits linking exhibits to spe-

12. Glover v. United States, 306 F.2d 594 (10th Cir. 1962).

13. Jackson v. Kansas City, Kan., 448 F.2d 518 (10th Cir. 1971).

14. Ellis v. State of Oklahoma, 430 F.2d 1352 (10th Cir. 1970), cert. denied, 401 U.S. 1010, 91 S.Ct. 1260, 28 L.Ed.2d 546; United States v. Perea, 413 F.2d 65 (10th Cir. 1969), cert. denied, 397 U.S. 945, 90 S.Ct. 960, 25 L.Ed.2d 125.

cific counts of the indictment. We view this as being in the nature of summary of the evidence by the trial court which is permitted.[15] We find no error, particularly in view of the record showing complete disclosure by the trial court of its intention to prepare the exhibit list. Following discussion, counsel for appellants approved of this, after being assured they would be permitted to see the list prior to its delivery to the jury.

Other points have been raised by appellants, including a contention the cumulative effect of the trial errors requires reversal. We have considered these other points raised and find them without merit.

Affirmed.

---

15. *See* Glazerman v. United States, 421 F. 2d 547 (10th Cir. 1970), cert. denied, 398 U.S. 928, 90 S.Ct. 1817, 26 L.Ed.2d 90; Sadler v. United States, 303 F.2d 664 (10th Cir. 1962); Davis v. United States, 227 F.2d 568 (10th Cir. 1955).