WATERS, District Judge:
Ralph F. Dreitzler was tried and convicted by a jury on twenty-three counts of willfully misapplying bank funds, in violation of 18 U.S.C. § 656, and on four counts of making false statements to a bank for the purpose of obtaining loans, contrary to 18 U.S.C. § 1014. Thereafter, the district court granted Dreitzler’s motion for judgment of acquittal on the twenty-three misapplication counts, but left intact the jury’s verdicts on the remaining counts. The United States appeals from the district court’s order granting Dreitzler’s motion for judgment of acquittal.[1] Dreitzler, ap-pellee here, appeals his convictions on the four false statement counts, and also asserts that the district court erred in several other respects. Because we are convinced that the district court erred in granting Dreitzler’s motion for judgment of acquittal, we reverse and remand for reinstatement of the jury’s verdicts on the twenty-three misapplication counts. In all other respects we affirm.
I. FACTS
Prior to his convictions in 1976, Dreitzler had been engaged in the insurance business for many years. In 1968, Dreitzler established his own insurance agency. The agency went through several name changes and eventually became known as R. F. Dreitzler and Co., Inc. Appellee was the majority *543 stockholder of R. F. Dreitzler & Co., Inc.,[2] and had total control over the day-to-day operations of his business. It is appropriate, therefore, to refer to R. F. Dreitzler & Co., Inc., as appellee’s agency.
The business of Dreitzler’s agency was to place various types of insurance with its clients in the Puget Sound area of the State of Washington. The income of the agency was derived from commissions generated on the sale of insurance. There was conflicting evidence elicited during the trial in regard to the profitability of appellee’s agency. While there was some testimony to the effect that the agency’s commissions (i. e., gross income) increased during the period from 1969 through 1975, other evidence indicated that Dreitzler’s agency lost money in five of those seven years.[3] Additional evidence revealed that Dreitzler had borrowed substantial amounts of money from his agency despite its precarious financial position.[4]
During these years of financial difficulty, Dreitzler devised a program of “premium financing” which required the participation of a bank. Dreitzler, a Director of the Continental Bank of Washington,[5] approached Lloyd Snider, a loan officer at that bank, and proposed a program whereby Dreitzler’s insurance clients would be able to borrow money from the bank to make a large single premium payment on an insurance policy. The insurance customers would pay 10% of the premium down and borrow the remaining 90% of the premium from Continental Bank. This 90% would be paid back to the bank in ten equal monthly installments.
As might be expected, the government and Dreitzler maintained divergent views as to Dreitzler’s influence on Continental Bank in the premium financing plan. The government introduced evidence which suggested that only two individuals were really involved in the plan: Dreitzler and Snider. According to this evidence, only Dreitzler dealt with the borrowers of the funds, Dre-itzler prepared the documents, obtained the necessary signatures and presented the documents to Snider at Continental Bank. No financial statement of any borrower was submitted to the bank. No loan application thus prepared by Dreitzler was rejected by Snider on behalf of the bank, since the bank relied on Dreitzler as a director. Any questions concerning the loans were referred to the Dreitzler agency and not the borrowers. Apparently the Board of Directors of Continental Bank did not first approve the loans. The evidence introduced by the government also established that the proceeds of the loans were paid directly to an R. F. Dreitz-ler & Co. account because Dreitzler had informed Snider that his agency would be handling the payment of the loans for its clients.
The United States also elicited substantial testimony which revealed the fraudulent nature of the premium financing program. A number of corporate officers of Dreitzler’s insurance clients testified that not only did their companies not seek premium financing through Continental Bank but, in fact, someone had forged their signatures on the loan documents.[6]
Finally, the government presented the testimony of Michele Burgoyne, appellee’s former secretary at R. F. Dreitzler & Co. *544 She examined many of the loan documents and, based upon her familiarity with appel-lee’s handwriting, concluded that Dreitzler had forged the names of the alleged borrowers.
From this array of evidence, the United States argued to the jury that Dreitzler had made false statements to Continental Bank and further that he had willfully misapplied the bank’s funds for the use of his agency.
Dreitzler attempted to present a different picture to the jury. He did not dispute the fact that many of his clients did not specifically authorize the loans. Nor did he argue that the funds were not transferred to the general account of R. F. Dreitzler & Co. Rather, appellee asserted that both the bank and some of his clients benefited from the loans: the bank by receiving interest on the loans, and his clients by actually having the funds used for premium financing.
Dreitzler also presented evidence which indicated that he personally guaranteed all the loans made by Continental Bank in its premium financing program. And, Dreitz-ler argued, his agency would have been able to pay off all the loans had Continental Bank not frozen his agency’s account in 1976. Finally, appellee introduced testimony of an FBI agent which cast some doubt on Burgoyne’s testimony concerning the forged documents.
Apparently, the jury chose not to believe the defense version of the transactions and, after some six hours of deliberation, found Dreitzler guilty on the 27 counts submitted to them. The trial court, however, disagreed with the jury’s conclusions, and granted a judgment of acquittal pursuant to F.R.Crim.P. 29(c) on the willful misapplication counts (Counts 1-15 and 17-24).
II. DOUBLE JEOPARDY
The first issue which must be dealt with is whether the United States is barred from appealing the judgment of acquittal on Counts 1-15 and 17-24 by the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution. Relying on the recent Supreme Court case of United States v. Martin Linen Supply Co., 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977), Dreitzler argues that the “Double Jeopardy Clause bars appellate review and retrial following a judgment of acquittal entered under Rule 29(c).”
We cannot agree that Martin Linen stands for the broad proposition asserted by Dreitzler. A reading of that case reveals that it is factually distinguishable from this one. In Martin Linen, the trial court had discharged a “hopelessly deadlocked” jury after it was unable to agree upon a verdict. The trial court then granted the defendant’s motion for judgment of acquittal. The United States sought to appeal that order pursuant to 18 U.S.C. § 3731. The Supreme Court held that such an appeal was not permitted on the facts of that case because the defendant would then be subject to multiple prosecutions, there being no verdict to reinstate if the government prevailed. Thus, “the Double Jeopardy Clause bars appeal from an acquittal entered under [F.R.Crim.P.] 29(c) after a jury mistrial . . . .” Id. at 575, 97 S.Ct. at 1356 (emphasis supplied).
Here, of course, there was no mistrial declared. The jury returned verdicts of guilty on 27 counts. Reversal of the district court’s judgment of acquittal will not subject Dreitzler to a second trial since there are jury verdicts which can be reinstated. See United States v. Wilson, 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232; United States v. Ramos, 558 F.2d 545, 546 (9th Cir. 1977); United States v. Rojas, 554 F.2d 938 (9th Cir. 1977). We hold that the Double Jeopardy Clause does not bar appellate review of the district court’s entry of judgment of acquittal. The United States may prosecute this appeal pursuant to 18 U.S.C. § 3731.[7]
*545 III. THE JUDGMENT OF ACQUITTAL ENTERED BY THE TRIAL COURT
The jury found Dreitzler guilty on 23 counts of willful misapplication of bank funds, in violation of 18 U.S.C. § 656.[8] The United States contends that the trial court then committed reversible error by granting appellee’s motion for judgment of acquittal. Dreitzler of course adopts the contrary view, and argues that the judgment of acquittal must be sustained.[9]
It is well settled that a district court does not have unlimited discretion in resolving a Rule 29(c) motion for judgment of acquittal. Rather, the district court must determine “whether at the time of the motion there was relevant evidence from which the jury could reasonably find [the defendant] guilty beyond a reasonable doubt, viewing the evidence in light favorable to the government.” United States v. Figueroa-Paz, 468 F.2d 1055, 1058 (9th Cir. 1972). “In ruling on a Rule 29(c) motion, a district court must bear in mind that ‘it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts and draw reasonable inferences from proven facts.’ [Citation omitted].” United States v. Rojas, supra at 943.
When these principles are applied to the facts of this case, it is apparent that the district court erred in granting the judgment of acquittal. Viewing the evidence in light favorable to the government reveals that there was sufficient evidence from which a jury could reasonably find that appellee, acting in his capacity as a director of Continental Bank, willfully misapplied bank funds.[10]
First, there was evidence from which the jury could conclude that Dreitzler willfully misapplied Continental Bank’s funds. The evidence established that Dreitzler set up bogus loan transactions, presented, or had presented, forged documents to the bank, and received the proceeds of the “loans” which he used for his agency’s benefit. Several individuals (e. g., William D. Se-wall, president of Western Tours, Inc.; Warren Foster, chairman of the Washington State Insurance Committee; and John J. Fitzgibbons, former controller of Heinicke Instruments) testified that premium financing arrangements had been set up by Dreitzler with Continental Bank purportedly for the benefit of their organizations — but without the specific approval of those organizations. These individuals also *546 testified that their names had been forged to the notes which evidenced the loans to their organizations. Lloyd Snider, the vice president of Continental Bank, testified that the bank dealt solely with the Dreitzler agency in consummating the loans in question. Snider also testified that Dreitzler himself, or someone from his agency, would present the previously executed notes and the other paper work involved to the bank. After the loans were approved (and all were), the proceeds were deposited directly into the R. F. Dreitzler & Co., Inc. account at Continental Bank.
This evidence, despite Dreitzler’s assertions that he never intended to defraud the bank and that he fully intended to repay the loans, was sufficient to allow the jury to find misapplication of Continental’s funds. The cases are clear that misapplication may be found where it is shown that a bank is deprived of its right to have custody of its funds, that is, its right to make its own decision as to how the funds are used. Golden v. United States, 318 F.2d 357, 360-361 (1st Cir. 1963); see also United States v. Kennedy, 564 F.2d 1329, 1339 (9th Cir. 1977). The government need not prove that the bank suffered any immediate loss, see Golden, supra at 360, but only that the bank’s funds were disbursed under a false record. Kennedy, supra at 1339; United States v. Fortunato, 402 F.2d 79, 81 (2d Cir. 1968), cert. denied, 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969).
There was also sufficient evidence to enable the jury to find that Dreitzler, by virtue of his status as a director of Continental Bank, misapplied the proceeds of the loans. There is no dispute that appellee was a director of Continental Bank and its second largest stockholder. Snider testified that it was specifically because of this connection that the bank “relied on or trusted [Dreitzler] to take care of the bank to see that the loans were okay.” Snider also testified that normal bank procedures were not followed because Dreitzler was a director of the bank. Furthermore, as we have noted above, there was evidence which indicated that Dreitzler or his agency prepared virtually all the paper work necessary to complete the loan transaction. No prior approval of these loans was ever given by the board of directors of Continental Bank.
Despite this evidence, appellee argues thpt he never misapplied bank funds by virtue of the fact that he was a director of Continental Bank. We feel, however, that the testimony of Lloyd Snider, when coupled with the other evidence showing appel-lee’s almost total control of the loan transactions, was enough to enable the jury to conclude that Dreitzler was acting in his capacity as a director of the bank when he misapplied the proceeds of some twenty-three loans.
The facts of this case are quite similar to those in United States v. Fortunato, supra. There, the evidence revealed that Fortunato was an assistant vice president of the Long Island Trust Company. During a sixteen-month period, he signed fictitious names to five loan applications. The applications also included fictitious biographical data and alleged reasons why the “borrowers” were seeking the loans. The proceeds of the loans were used for Fortunato’s benefit. The jury determined that these facts constituted a violation of 18 U.S.C. § 656, and convicted Fortunato on six counts of willful misapplication of bank funds — even though Fortunato argued that he always intended to repay the loans. The Second Circuit affirmed, noting that misapplication of bank funds occurs when an officer loans money to fictitious borrowers or causes the loans to be made to his own benefit. Id. at 81.
Similarly, in United States v. Kennedy, supra, a panel of this court recently upheld the conviction of an attorney (not employed by the defrauded bank) who was charged with, inter alia, aiding and abetting in the misapplication of bank funds. We there noted that a violation of 18 U.S.C. § 656 occurs where an individual falsely represents his financial status and actual motive for the purpose of obtaining the loan, and then turns over the proceeds of the loan to another person. 564 F.2d at 1339.
*547 Here, the trial court did not agree that Dreitzler acted as a director when he obtained the loan proceeds and granted Dreitzler’s motion for judgment of acquittal. The court, relying upon Golden v. United States, supra, concluded that appel-lee was instead acting as an agent for his insurance company in these transactions.
In Golden, there was a dispute as to whether the defendant had received certain life insurance proceeds in his capacity as the president of the Everett Bank or as an escrow agent. Evidence was introduced at trial which would have allowed the jury, if properly instructed, to conclude that Golden was not guilty of a violation of 18 U.S.C. § 656. The First Circuit therefore ruled that it was reversible error for the trial court to have failed to instruct on defendant’s theory that he was acting as an independent escrow agent, and not a bank officer, when he received the funds — thus making it impossible to have misapplied bank funds. The case was remanded for a new trial.
In the instant case, the trial court concluded that Golden holds that a defendant may be convicted of violating § 656 only if he acts “in his official capacity as a bank officer.” We cannot agree that Golden stands for such a proposition. We read Golden as holding that, based upon the facts of that case, it was error not to instruct on the defendant’s theory that he was acting as an independent escrow officer.
Moreover, to adopt a test which would require a trier of fact to make a determination in each § 656 case as to whether an accused is acting in his “official capacity” would be inappropriate. The statute does not require such an analysis. And no authority has been cited to the court which holds that the reach of § 656 should be limited to the extent the trial court found and which Dreitzler urges we adopt now. The cases we have reviewed teach that a defendant may be convicted of violating § 656 if the government establishes beyond a reasonable doubt that bank funds were misapplied by virtue of the fact the defendant was connected in some capacity with a bank which enables him to gain access to bank funds. See, e. g., United States v. King, 484 F.2d 924 (10th Cir. 1973), cert. denied, 416 U.S. 904, 94 S.Ct. 1607, 40 L.Ed.2d 108 (1974), (director convicted of violating § 656 by causing bank funds to be converted to his own use); United States v. Cooper, 464 F.2d 648 (10th Cir. 1972), cert. denied, 409 U.S. 1107, 93 S.Ct. 901, 34 L.Ed.2d 688 (1973), (defendant officer/director convicted for causing loan proceeds to be returned to him from fictitious borrower); United States v. Rickert, 459 F.2d 352 (5th Cir. 1972), (conviction of bank president affirmed where evidence revealed that he changed bank records to cover losses on bad loans); United States v. Edick, 432 F.2d 350 (4th Cir. 1970), (conviction of defendant affirmed where government established he diverted bank funds to his own use after gaining access to bank records in his capacity as manager of a separate bookkeeping company).
Here, the government had the burden of establishing that Dreitzler misapplied bank funds in his capacity as a director. We hold that there was sufficient relevant evidence from which the jury could reasonably find that he would not have been able to misapply the funds of Continental Bank but for the fact that he was a director of that bank.
IV. THE INSTRUCTIONS GIVEN BY THE TRIAL COURT
Because we have determined that it was error for the trial court to have granted the judgment of acquittal, it becomes necessary to examine appellee’s contention that the jury was improperly instructed in this case. Dreitzler argues that the trial court erred in instructing the jury on “willful misapplication” in several respects. First, it is argued that the district court improperly instructed the jury as to the elements necessary to establish a violation of § 656.
The trial court initially instructed the jury (court’s instruction “No. 6”) that the following seven facts had to be found in order to convict the appellee on Counts One through Twenty-four:
*548 “1. That at the time of the offense charged in that count the defendant was a director of the Continental Bank of Burien.
2. That the Continental Bank of Bu-rien was a bank insured by the Federal Deposit Insurance Corporation.
3. That on or about the date given in the count the defendant did, by means of documents which the defendant then knew bore one or more forged signatures, cause or induce the bank to make a loan of its funds.
4. That the defendant did so willfully with the intent to injure or defraud the bank.
5. That the employees of the bank did not know that any signature was forged.
6. That the bank was induced, at least in part, to make the loan by reason of the fact that defendant was a director of the bank.
7. That the amount of the loan was in excess of $100.00.”
This instruction did not track the language of the indictment in that none of the elements specified that Continental’s funds had been misapplied. The trial judge realized this problem existed during the closing argument of government counsel. The jury was then excused and the court and counsel discussed the language of the indictment and the appropriate language of the so-called “element instruction.” The trial court decided to reinstruct the jury as follows:
“In order to establish the offense charged in each of Counts I through XXIV of the indictment, the government must prove beyond a reasonable doubt each of the following elements as to each count:
1. That at the time of the offense charged in that count the defendant was a director of the Continental Bank of Burien.
2. That the Continental Bank of Bu-rien was a bank insured by the Federal Deposit Insurance Corporation.
3. That, by virtue of his position as director, he willfully misapplied money or funds of the bank.
4. That the defendant did so willfully with the specific intent to injure or defraud the bank.
5. That the amount of the money or funds misapplied was in excess of $100.00.”
This instruction was proper since it tracked the language of both § 656 as well as that of the indictment.
Dreitzler argues, however, that the trial court committed error both in giving the first element instruction since it was inaccurate, and by giving the second element instruction since too much emphasis was thereby placed on one instruction.
We find both of these arguments to be without merit. It was the duty of the trial court to properly instruct the jury as to the elements necessary to establish a violation of § 656. Instruction No. 6, as originally given by the court, seemed to deal more with a violation of 18 U.S.C. § 1014 than with a violation of § 656. It was, therefore, incumbent upon the trial court to provide the jury with a corrected instruction. See Gonzales v. United States, 286 F.2d 118, 122 (10th Cir. 1960), cert. denied, 365 U.S. 878, 81 S.Ct. 1028, 6 L.Ed.2d 190 (1961); cf. United States v. Lewis, 362 F.2d 759, 763 (2nd Cir. 1966), (error, if any, in original instruction was cured by the trial court after the jury requested supplemental instructions). The judge specifically told the jury that they were to disregard the first instruction No. 6 he had given. Furthermore, the trial court gave a copy of the corrected instruction to the jury for its use in deliberations. This also reduced the possibility of confusion.
Dreitzler offers no legal or factual basis to allow this court to conclude that it was error for the trial court to have corrected an improper instruction to the jury. While some additional emphasis was perhaps placed on the “element” instruction, on balance, this factor is more than outweighed by the interest of both Dreitzler and the government in having the jury properly instructed.
*549 Dreitzler also contends that it was error for the trial court to have refused appellee’s proposed element instruction.[11] We have already noted, however, that the trial court properly instructed the jury as to the elements necessary to establish a violation of § 656. Furthermore, appellee’s proposed instruction does not comport with the language of § 656 in that there is no requirement in either that section or in any case cited to this court construing it that misapplication must be “the result of defendant’s control, direction and power of management as director of the bank.” This proposed element is simply a misstatement of the law.
Appellee next argues that the trial court erred in instructing the jury as to the definition of “willfully.” The jury was instructed that “[a]n act is done willfully if done voluntarily and intentionally with knowledge that it is against the law.” This instruction appears to be a slightly modified version of Devitt and Blackmar’s § 14.06,[12] in that the trial court did not include the “bad purpose” language found in that section. However, this was not error. There is no requirement that the phrase “bad purpose” be included in an instruction on “willfulness” where, as here, the instructions as a whole communicate the proper notion of specific intent in understandable terms. Cooley v. United States, 501 F.2d 1249, 1253 (9th Cir. 1974), cert. denied, 419 U.S. 1123, 95 S.Ct. 809, 42 L.Ed.2d 824 (1975).[13]
Relying on United States v. Gens, 493 F.2d 216 (1st Cir. 1974), and United States v. Docherty, 468 F.2d 989 (2nd Cir. 1972), appellee argues that it was error for the trial court to fail to give appellee’s proposed instruction on willful misapplication. There is no merit to this argument. As we have recently noted, neither Gens nor Docherty is good law in this circuit. United States v. Kennedy, supra, 564 F.2d at 1339. Furthermore, the instruction given by the trial court properly stated the law in regard to “intent to defraud.”[14]
Dreitzler finally argues that the court erred in failing to give instructions on corporate versus individual liability and on aiding and abetting. We have analyzed appellee’s position and have carefully reviewed all the instructions given by the district court. We are convinced that, taken as a whole, the trial court fairly and adequately instructed the jury as to the issues it had to resolve. See United States v. Patrick, 542 F.2d 381, 389 (7th Cir. 1976), cert. denied, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977).
Y. DELAY IN BRINGING DREITZLER TO TRIAL
Dreitzler was arrested on a complaint February 12, 1976. An indictment was returned by the Grand Jury on June 15,1976. Trial finally commenced on November 9, 1976. Dreitzler asserts that the 271 day delay from his arrest to his trial amounts to a denial of his right to a speedy trial under the Sixth Amendment and Federal Rule of Criminal Procedure 48(b).
Appellee properly directs our attention to Barker v. Wingo, 407 U.S. 514, 92 *550 S.Ct. 2182, 33 L.Ed.2d 101 (1972), for the correct analysis of the constitutional issue. There, the Supreme Court specified four factors which must be considered in analyzing a potential deprivation of the right to a speedy trial: length of delay, the reason for the delay, the defendant’s assertion of his right, and prejudice to the defendant. 407 U.S. at 530, 92 S.Ct. at 2192.
It is true, as appellee contends, that a delay of almost nine months is a lengthy one. However, an examination of the facts of this case in light of the other Barker criteria leads us to conclude that appellee was not deprived of his constitutional right to a speedy trial.[15]
First, as noted by the government and the trial court, this case was a complex one. It involved some twenty-four separate loans made by Continental Bank over a period of more than two years (from October 1973 through January 1976). The total amount of these loans exceeded $1,500,000. Twelve different business entities were involved in appellee’s “premium financing” plan; several were involved in more than one loan transaction. Furthermore, appellee’s financial dealings with his own agency added to the complexity of this case.[16] The facts of these transactions were apparently not known to Continental Bank, or the United States, until January 1976. It does not seem to us to be unreasonable for the government to require some four months to attempt to piece together these complicated financial transactions.
It is interesting to note that at Dreitzler’s arraignment on June 25, 1976, Dreitzler’s counsel (who continues to represent Dreitz-ler on this appeal) agreed that this was a difficult case, involving “28 very complex transactions.” At that time counsel also indicated that an October 1976 trial date would probably be necessary unless the government agreed to turn over its “Jencks material” several months prior to trial.[17] After an extended discussion with counsel on this matter, the district court finally stated that it could not compel the United States to turn over its Jencks material before trial and that trial would probably begin about mid-October 1976. This date was later moved ahead to November 9, 1976.
It seems apparent to us that Dreitzler’s counsel, although continuing to assert his client’s right to a speedy trial, in effect agreed to a trial date at least some three months after the arraignment. He too realized the complex nature of this case. For Dreitzler to now assert that he was denied his right to a speedy trial because the government would not waive the provisions of 18 U.S.C. § 3500 is totally without merit.
Finally, we are aware of no inordinate prejudice suffered by Dreitzler by having to wait 271 days before going to trial.[18] Dreitz-ler asserts that important records were lost or pilfered, witnesses changed their testimony, the Seaside Police Department harassed him, and certain businesses discriminated against him. None of these assertions is borne out by the record before us.
Insofar as “lost or pilfered records” are concerned, Dreitzler has nowhere indicated which documents fall into this category. Furthermore, there is absolutely no support in the record, other than the self-serving hearsay statements of Dreitzler and his counsel, that any documents were lost or *551 stolen. Similarly, the only support for Dreitzler’s assertions of police harassment and discrimination by local businesses is Dreitzler’s (and his counsel’s) hearsay observations.
We have carefully examined the transcripts of the testimony of the three witnesses who allegedly changed their testimony during the delay between arrest and trial.[19] Nothing in them indicates to us that any of these witnesses altered their testimony at the time of trial.
VI. COUNTS 25 THROUGH 28
Counts 25 through 28 of the indictment charged Dreitzler with violations of 18 U.S.C. § 1014.[20] The jury concluded that Dreitzler knowingly made false statements on four separate loan applications submitted to Continental Bank for the purpose of obtaining loans, and convicted him on these counts. Dreitzler now asserts that there was insufficient evidence to sustain these guilty verdicts.
It is settled that in analyzing an attack on the sufficiency of the evidence, an appellate court must sustain the verdict of a jury if there is substantial evidence, taking the view most favorable to the government, to support it. Hamling v. United States, 418 U.S. 87,124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974); Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed.2d 680 (1942); United States v. Francisco, 536 F.2d 1293, 1298 (9th Cir. 1976), cert. denied, 429 U.S. 942, 97 S.Ct. 360, 50 L.Ed.2d 312 (1976). Viewing the evidence presented to the jury in this light, it is clear that there was substantial evidence to convict Dreitzler on Counts 25 through 28.
As we have noted, there was relevant evidence from which the jury could infer that Dreitzler not only prepared the fraudulent loan applications, but also that he forged the necessary signatures on the applications. Lloyd Snider testified that the premium financing program was initiated by Dreitzler, that all loan applications were prepared outside the bank and presented to the bank by Dreitzler or one of his employees, that the payment books were sent directly to Dreitzler’s insurance agency and not to the “borrowers,” and that the proceeds of the “loans” were paid to the Dreitzler agency. Officers of four of the twelve corporate “borrowers” testified that their signatures had been forged to the loan applications involved. Appellee’s former secretary, Michele Burgoyne, testified that the forged signatures appeared to be in Dreitzler’s handwriting. This evidence, obviously believed by the jury, was sufficient to convict Dreitzler on four violations of § 1014. The verdicts must be sustained. Hamling v. United States, supra.
VII. MOTION FOR JUDGMENT OF ACQUITTAL
Shortly before the close of the government’s case, Dreitzler moved for a judgment of acquittal pursuant to F.R.Crim.P. 29(a).[21] At that time, Dreitzler argued to the trial court that the government had failed to present a prima facie case to establish either willful misapplication of bank funds (18 U.S.C. § 656) or the making of false statements to a bank (18 U.S.C. § 1014). The district judge deferred ruling *552 on this motion until Dreitzler rested, and then denied the motion. Dreitzler now asserts that it was error for the trial court to not have immediately ruled on this motion.
This court has observed that “[i]t is a mandatory requirement of Rule 29(a), that a motion for judgment of acquittal, made at the close of the Government’s evidence, be ruled upon before [a] defendant is required to proceed with his evidence.” Sullivan v. United States, 414 F.2d 714, 715 (9th Cir. 1969). However, we also noted in Sullivan that a failure to timely rule on such a motion, while error, is not prejudicial if the government’s evidence at the time of the motion is sufficient to support the jury verdict. Id.; see also Weathers v. United States, 322 F.2d 566 (9th Cir. 1963).
There is no need to again review the evidence proffered by the United States which was available to support the jury’s verdict on each count submitted to it.[22] It is enough to note that the evidence, at the time Dreitzler made his Rule 29(a) motion, was sufficient to support the verdicts of guilty. Thus, there was no prejudicial error here.
It also seems to us that Dreitzler waived any objection to the procedure followed by the district judge. At the time the motion for judgment of acquittal was made, the trial court asked Dreitzler’s counsel if he desired to proceed with his case before the motion was ruled upon. Counsel replied “[tjhat’s fine, Your Honor,” and later stated, “I would be more than happy to allow the Court to hold off on [ruling on the motion] so long as I make a record at this time of the nature of the . . . motion.” Counsel then proceeded to present the defense case. Nowhere in the record does it appear that Dreitzler made a timely objection to the trial judge’s decision to postpone a ruling. In fact, it seems apparent that Dreitzler affirmatively approved this procedure, and thereby waived any objection he might have had in this ease.
VIII. VENUE
Dreitzler’s arraignment was widely reported in the Seattle, Washington media. Several other stories appeared in the Seattle press during the following months. These stories dealt with the financial outlook of the Continental Bank and with various pre-trial proceedings in the case. Based upon this pre-trial publicity, Dreitzler made a motion for change of venue (F.R.Crim.P. 21(a)), arguing that he was unable to receive a fair trial in Seattle. The trial court ruled that “the pre-trial publicity in this case was neither of the magnitude nor of the character which would jeopardize the defendant’s right to an impartial jury in a trial . . . ,” and denied the motion. Dreitzler argues that this denial was error.
A motion for a change of venue is addressed to the sound discretion of the trial court. United States v. Jobe, 487 F.2d 268, 269 (10th Cir. 1973), cert. denied, 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974); Lyons v. United States, 325 F.2d 370, 376 (9th Cir. 1963), cert. denied, 377 U.S. 969, 84 S.Ct. 1650, 12 L.Ed.2d 738 (1964). “The ultimate question confronting a trial judge in situations such as this is whether it is possible to select a fair and impartial jury from a jury array selected from the vicinity where the publicity occurred.” United States v. Jobe, supra at 269.
In this case, we cannot conclude that the trial court clearly abused its discretion in denying the motion to change venue. See Lyons v. United States, supra at 376. Prior to ruling on Dreitzler’s motion, the trial judge reviewed copies of the newspaper articles published about this case. He concluded that Dreitzler, despite this publicity, would be able to receive a fair trial in Seattle.
Dreitzler was also assured of receiving a fair trial by the voir dire of the prospective jurors conducted by the trial court. The court first asked the jurors if any of them had heard of the case, read about it or talked with anyone about it. When there *553 was no response to this question, the court further inquired of the jury panel by noting that there had been a newspaper article concerning the case in January or February of 1976. At that point, three jurors indicated that they might have read something about the case. Upon further questioning, each of these jurors indicated that the articles had not affected his or her thinking, and that he or she could give Dreitzler a fair trial. It should be noted that none of these three jurors participated in the deliberation of the case.
This court has observed that a “trial judge in a noteworthy and controversial case cannct be expected to impanel jurors who have not heard about the case.” United States v. Polizzi, 500 F.2d 856, 880 n. 40 (9th Cir. 1974), cert. denied, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975). Here, however, the trial court, by carefully questioning the prospective jurors, was able to determine which of them were exposed to potentially prejudicial pre-trial publicity. Two of the jurors who had been so exposed were apparently excused by trial counáel; the other was later excused by the trial court. The end result was that Dreitzler was tried by a jury which did not hold any preconceived notions as to his guilt or innocence on the basis of pre-trial publicity. Dreitzler was not deprived of a fair trial.
IX. DREITZLER’S PRE-TRIAL MOTIONS
Prior to trial, Dreitzler made motions for a bill of particulars, a list of the government’s witnesses and their statements, and a list of the government’s expert witnesses and the results of their tests. These motions were denied by the trial court.
There was no error in these rulings. The granting or refusal to grant a bill of particulars is a matter within the discretion of the trial court, and its decision will not be disturbed absent an abuse of discretion. United States v. Clay, 476 F.2d 1211, 1215 (9th Cir. 1973); Yeargain v. United States, 314 F.2d 881, 882 (9th Cir. 1963). There was no abuse of discretion here inasmuch as the indictment was adequate to allow Dreitzler to prepare his defense. See United States v. Andrino, 501 F.2d 1373, 1378 (9th Cir. 1974).
Dreitzler was not entitled to a list of the government’s witnesses prior to trial. United States v. Thompson, 493 F.2d 305, 309 (9th Cir. 1974), cert. denied, 419 U.S. 834, 95 S.Ct. 60, 42 L.Ed.2d 60 (1974). Nor was he entitled to the witnesses’ statements prior to trial. 18 U.S.C. § 3500; see also United States v. Washabaugh, 442 F.2d 1127, 1129 (9th Cir. 1971).[23] Since the government called no expert witnesses in this case, Dreitzler was not prejudiced by the trial court’s decision not to order disclosure of the names of expert witnesses and their test results.[24]
Finally, Dreitzler was not entitled to have the prior statements of William D. Sewall and Edwin 0. Cedergreen produced prior to trial. Assuming arguendo that there were written statements of these witnesses in the government’s possession, the Jencks Act did not require their disclosure until the direct examination of these witnesses was concluded. This analysis is not modified by the fact that these statements included statements allegedly made by Dreitzler himself. See United States v. Walk, 533 F.2d 417, 420 (9th Cir. 1975).
The judgment appealed from in the appeal of Ralph F. Dreitzler, No. 77-1546, is affirmed.
The judgment appealed from in the appeal of the United States, No. 77-1591, is reversed and the case is remanded for reinstatement of the jury verdicts on Counts 1 through 15 and 17 through 24.

. At trial, the testimony of several former employees of R. F. Dreitzler & Co., Inc., established that appellee owned at least 75% of the outstanding stock of that company.

. R. F. Dreitzler & Co., Inc., had a net operating loss which ranged from a low of approximately $3900 for the year ending April 30, 1971 to a high of approximately $30,000 for the year ending April 30, 1970. The agency was profitable only in 1972 ($1943 in net income) and in 1974 ($29,438 in net income).

. Dreitzler had borrowed more than $282,000 from his agency by 1976.

. Dreitzler was a founder, the second largest stockholder, and one of three of the “most active” directors of Continental Bank.

. For example, Kenneth Davis, president of the Anchorage Chrysler Center, testified that he never authorized Dreitzler to obtain premium financing for his corporation and that someone else had signed his name to the loan documents.

. Dreitzler argues that, in granting the Rule 29(c) motion, the trial court made a factual determination which superseded the jury’s factual determination and, therefore, a new trial to resolve the issue of guilt or innocence will be required if the United States prevails here on appeal. We are not persuaded. Even assuming appellee’s premise is correct (and we ex *545 press no view in that regard), the conclusion does not follow. The Supreme Court has indicated that the government may appeal the entry of a judgment of acquittal where there is a jury verdict to reinstate even if the district court has relied to some degree on evidence presented at trial. United States v. Wilson, supra.

. 18 U.S.C. § 656 provides in relevant part: “Whoever, being an officer, director, agent or employee of, or connected in any capacity with any . . . insured bank . . willfully misapplies any of the moneys, funds or credits of such bank . . shall be fined not more than $5,000 or imprisoned not more than five years, or both . . . .”

. Dreitzler moved for judgment of acquittal on three separate occasions. The first was styled a “motion to dismiss” and was made at the close of the government’s case pursuant to F.R.Crim.P. 29(a). The trial judge deferred ruling on this motion until Dreitzler rested. Dreitzler contends that the delay in ruling prejudiced him; this contention will be discussed in § VII, infra. Dreitzler also moved for a judgment of acquittal at the conclusion of his case pursuant to F.R.Crim.P. 29(a). That motion was denied by the trial court. After the jury returned its verdicts, however, the trial court reversed itself and granted Dreitzler’s motion on the 23 willful misapplication counts only. See F.R.Crim.P. 29(c). It is this last ruling which the government asserts was reversible error.
Rule 29(c) in pertinent part provides: “If a verdict of guilty is returned the court may on motion set aside the verdict and enter judgment of acquittal.”

. The indictment charged Dreitzler with misapplication of funds while acting “in his capacity as a director” of Continental Bank. It was, therefore, incumbent upon the United States to establish this element beyond a reasonable doubt. In Re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); United States v. Powell, 145 U.S.App.D.C. 332, 334-335, 449 F.2d 994, 996-997 (1971). Thus, we do not reach the government’s argument that 18 U.S.C. § 656 is, in effect, a “strict liability” statute when applied to the director of a bank.

. Dreitzler argues that the trial court should have instructed the jury that:
“In order to establish the offense charged in each of counts I through XXIV of the Indictment the government must prove beyond a reasonable doubt each of the following elements as to each count:
1- That at all times charged herein the defendant was a director of the Continental Bank.
2- That the defendant willfully misapplied money or funds belonging to the bank at the time of misapplication.
3- The defendant misapplied the funds without the knowledge or consent of the Continental Bank or its agent.
4- That said misapplication is the result of the defendant’s control, direction and power of management as director of the bank.
5- That the defendant misapplied said funds with the specific intent to injure and defraud the bank.”

. E. Devitt and C. Blackmar, Federal Jury Practice and Instructions § 14.06 (3d Ed. 1977).

. United States v. Sirhan, 504 F.2d 818 (9th Cir. 1974), relied upon by appellee, does not stand for a contrary proposition.

. The trial court apparently relied upon Devitt and Blackmar, supra, § 16.05.

. Similarly, we conclude that there was no abuse of discretion in the trial court’s denial of appellee’s motion to dismiss pursuant to F.R. Crim.P. 48(b). See United States v. Frost, 431 F.2d 1249 (1st Cir. 1970), cert. denied, 401 U.S. 916, 91 S.Ct. 896, 27 L.Ed.2d 817 (1971).

. See note 4, supra.

. The government of course is not required to disclose its witnesses’ statements until the witness has testified on direct examination. 18 U.S.C. § 3500(a).

. This is not to say that there was no harmful effect on Dreitzler by this delay. We recognize that any person arrested and indicted for a criminal offense is bound to suffer anxiety and, perhaps, public scorn. See Barker v. Wingo, supra, 407 U.S. at 532, 92 S.Ct. at 2193. We are here concerned, however, only with whether the actual prejudice suffered by Dreitzler outweighs the reasons for delay in this case.

. These witnesses were: Michele Burgoyne, appellee’s former secretary; William D. Sewall, vice president of Grayline, whose name was forged to certain notes evidencing “loans” by Continental Bank to Grayline; and Edwin O. Cedergreen, vice president of Western Tours, Inc., whose signature was also forged on notes evidencing “loans” to his company.

. 18 U.S.C. § 1014 provides in pertinent part:
“Whoever knowingly makes any false statement or report for the purpose of influencing in any way the action of . any bank the deposits of which are insured by the Federal Deposit Insurance Corporation upon any application ... or loan . . . shall be fined not more than $5,000 or imprisoned not more than two years, or both.”

. F.R.Crim.P. 29(a) provides in part:
“The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.”

. See §§ III, VI, supra.-

. Despite the literal language of the Jencks Act, the government apparently disclosed all Jencks material several days prior to trial.

. Michele Burgoyne was not called as an “expert” on the handwriting of Dreitzler. As Dreitzler’s former secretary, she was a qualified non-expert to testify as to whether handwriting on certain government exhibits was that of Dreitzler. See Rule 901(b)(2), Federal Rules of Evidence; 5 Weinstein’s Evidence U 901(b)(2)[01] at 901-23.