**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Henry C. HARENBERG,**
**Defendant-Appellant.**

**No. 82–1851.**

United States Court of Appeals,
Tenth Circuit.

April 30, 1984.

---

Richard J. Smith, Asst. U.S. Atty., Albuquerque, N.M. (William L. Lutz, U.S. Atty., Albuquerque, N.M. with him on the brief), for plaintiff-appellee.

Winston Roberts-Hohl, Santa Fe, N.M. (James L. Brandenberg, P.C., Albuquerque, N.M. with him on the briefs), for defendant-appellant.

Before BARRETT and LOGAN, Circuit Judges, and JENKINS, District Judge.*

BARRETT, Circuit Judge.

Harenberg appeals from a jury verdict convicting him of a series of felony and misdemeanor offenses. Harenberg was found guilty of having violated four separate federal statutes: (1) 18 U.S.C. § 371, which prohibits conspiring to impede the United States in its collection of income taxes; (2) 26 U.S.C. § 7206(1), which prohibits the filing of a false tax return; (3) 18 U.S.C. § 656 (seven counts), which prohibits the misapplication of funds of F.D.I.C.-insured banks; and (4) 18 U.S.C. § 215 (seven counts), which prohibits bank officers from participating in "loan kickback" schemes.

Harenberg was indicted with Nick Kapnison and Ben Bronstein in Albuquerque, New Mexico. Pursuant to motion, the three were granted separate trials outside the Albuquerque area. Harenberg was then tried in Roswell, New Mexico. On the conspiracy charge, he was fined $10,000 and ordered imprisoned for eighteen months. On the falsification charge and the banking violations he was fined $5,000 for each offense. On all remaining counts he received a suspended sentence, probation, and certain community service obligations.

### Facts

In 1976, Bronstein purchased the controlling interest in the First National Bank of Clovis, New Mexico. Soon thereafter, he appointed Harenberg as the Bank's president, and Kapnison became a director. Kapnison and Bronstein had also allied themselves in a small-business investment company called Venture Capital; Harenberg was vice-president of this company before moving on to the Bank. The case presented by the United States disclosed a scheme by which the three men used their positions at the Bank and Venture Capital to impose substantial "fees" on financially-troubled borrowers. In a nutshell, the scheme worked as follows: (1) Venture Capital functioned as a magnet attracting borrowers; (2) Bronstein or Kapnison would then "guarantee" a loan to the borrower, but only for a substantial fee; (3) The First National Bank would then approve the loan to the borrower; (4) the borrower would then pay Kapnison the "guarantee fee" out of the loan proceeds; (5) the fee would then be secretly split among Kapnison, Bronstein, and Harenberg. Apparently, the operation was quite successful; in the seven loans out of which the charges grew, approximately sixteen percent (16%) of the funds loaned by the bank made their way back to the defendants in the form of "guarantee fees."[1] (Appellee's Brief at 6).

Eventually, Kapnison resigned from the Bank's board of directors, making himself legally eligible to receive guarantee fees. The United States presented testimony that Kapnison reported all of the guarantee fees as personal income, offsetting this amount with substantial deductions from his other business operations. Thus, the United States asserted that Kapnison's tax return was false because it claimed all of the kickback income, and that Bronstein's and Harenberg's were false because they claimed none of it.

---

* Honorable Bruce S. Jenkins of the United States District Court for the District of Utah, sitting by designation.

1. The scheme operated substantially as outlined in six of the seven loans at issue in this case. Those loans were referred to as, "Flagan", "PIT", "RHS", "Azar", "Diane, Inc.", and "Manzano". The seventh transaction, however, revolved around an extension of a loan payment period rather than the actual procurement of the loan. This transaction was known as "Homaby Bay" and was no different in substance from the other loans.

On appeal, Harenberg makes numerous allegations of error. We find them without merit and, therefore, affirm.

## I.

### Proof Relating to 18 U.S.C. § 656

■ Harenberg argues the government failed to prove beyond a reasonable doubt all of the elements necessary for a conviction pursuant to 18 U.S.C. § 656. As we have previously held, the statutory elements of a section 656 violation are: (1) the willful (2) misapplication (3) of money, funds or credits (4) of a federally-protected bank. *United States v. Twiford*, 600 F.2d 1339, 1343 (10th Cir.1979). Harenberg contends the government failed to prove that "bank funds" were involved or, alternatively, that Harenberg "willfully misapplied" such funds.

*Bank Funds:* Harenberg argues that under the definitions of the Uniform Commercial Code, the "fees" paid to him by Kapnison were not "bank money, funds or credits." He maintains that the First National Bank of Clovis lost all ownership interest in the funds loaned after it sent drafts to the borrowers. Consequently, Harenberg argues any "kickbacks" Harenberg may have received were no longer bank funds, but the funds of borrowers.

■ We believe this argument illustrates a myopic view of the loan transactions. By focusing upon the flow of funds and the consequent changes in the incidence of ownership, Harenberg ignores completely the substance of the transactions. The evidence shows Harenberg had a concealed interest in the loans involved in this case. This interest did not suddenly materialize *after* the bank funds were disbursed to the borrowers; rather, it existed well before the borrowers even made loan applications to the First National Bank of Clovis. In fact, according to the evidence, this interest was the motivating factor behind Harenberg's approval of the loans. Certainly, then, Harenberg's concealed interest related to "bank funds." To argue that this fact somehow disappears because the bank funds were disbursed to borrowers seems to us to miss the forest for the trees.[2] We find the government's proof on this element was adequate.

*Willful Misapplication:* Harenberg also contends that the government did not show he possessed the requisite criminal intent to support a claim of willful misapplication. We disagree.

*United States v. Twiford, id.,* included facts substantially similar to those involved in the present case. In *Twiford,* the defendant, an officer and director of the Bank of Colorado, made several loans to different parties and then received kickback fees from the borrowers. We held that this deceptive self-dealing fit within the definition of "willful misapplication." *Id.* at 1341. In reaching this conclusion, we noted that such kickback schemes involved the misrepresentation of the true state of bank records "with the intent that bank officials, bank examiners, or the Federal Deposit Insurance Corporation will be deceived." *Id.* [quoting *United States v. Kennedy,* 564 F.2d 1329, 1339 (9th Cir. 1977)]. *Twiford* thus held implicitly that evidence of an "intent to deceive" supplied

---

**2.** We hold a similar view about Harenberg's contention regarding the "Homaby Bay" transaction. This incident differed factually from the other loans because the "fees" involved derived from an extension of an existing loan. Kapnison accepted $25,000.00 from the borrower in return for this extension. The borrower testified that he intended and understood that the full amount was to be applied to interest and principle. (Tr., Vol. IV, 264). Instead, Kapnison deposited only $9,109.59 on the bor-

rower's behalf; the evidence suggested that he split the remaining amount with Harenberg and Bronstein.

Again, Harenberg argues that "bank funds" were not involved in this transaction. We disagree. As the government argues, "Kapnison simply misappropriated the Bank's money as it was being collected, instead of as it was being disbursed. The jury took that view of the evidence, and there the matter should rest." (Appellee's Brief at 17).

the necessary proof of criminal intent required by section 656. *See also United States v. Cooper,* 464 F.2d 648, 652 (10th Cir.1972).[3] Upon reviewing the record, we hold there is substantial evidence of Harenberg's intent to deceive the Bank's board of directors and, therefore, the government's proof was adequate.

## II.

### Double Jeopardy

Because Harenberg was charged and convicted under two separate but similar federal banking statutes, 18 U.S.C. § 656 (misapplication of bank funds) and 18 U.S.C. § 215 (receiving loan kickbacks), he now contends he was placed twice in jeopardy for the same offense. He argues that the convictions rested solely upon the reception of kickbacks and, therefore, the section 656 misapplication charge was redundant and inappropriate. We disagree.

◾ The established test for determining whether one transaction can provide the basis for conviction under two different statutes was stated in *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932):

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is *whether each provision requires proof of a fact which the other does not.* (Emphasis added).

The Supreme Court has reaffirmed this test on many occasions, *see, e.g., Albernaz*

v. *United States,* 450 U.S. 333, 337, 101 S.Ct. 1137, 1141, 67 L.Ed.2d 275 (1981), and the test has long been followed by this court. *See, e.g., United States v. Neal,* 692 F.2d 1296, 1306 (10th Cir.1982); *Chrysler v. Zerbst,* 81 F.2d 975, 976 (10th Cir.1936).

◾ In applying this test to the present case, it is clear that each statute "requires proof of a fact which the other does not." The elements of a section 656 misapplication violation are: (1) the willful (2) misapplication (3) of money, funds, or credits (4) of a federally-protected bank. In contrast, the elements of a section 215 offense are: (1) the receiving or consenting to receive (2) a fee, commission, gift, or thing of value (3) for procuring or attempting to procure (4) a loan from a federally-protected bank. As we pointed out in *Twiford,* the "lack of identity between the two crimes is not merely a formalistic or semantic one." 600 F.2d at 1343. In this case, for example, the section 656 misapplication provision prohibited Harenberg's deceptive conduct and concealed interest in making loans; his conviction on this charge was not dependent upon his actual reception of a fee. The section 215 provision, on the other hand, specifically proscribed the taking of a fee; his conviction on this charge was not dependent upon his concealed interest or deception of the board. Thus, Harenberg's conviction under both provisions rested upon the proof of different statutory elements and different transactional facts.[4]

## III.

### Conspiracy Evidence

Harenberg next argues that the district court made various errors in admitting evi-

---

**3.** Harenberg attempts to distinguish *Twiford* and *Cooper* by asserting that "unlike the proof in *Cooper* and *Twiford,* there was no proof of a violation of 18 U.S.C. 656 in any counts." (Appellant's Reply Brief at 1). This statement merely begs the question and does not negate in any way the relevance of the underlying rationale in those cases that "the factor of controlling significance was that the defendants' were receiving benefits of loans without disclosing this fact." *United States v. Twiford, supra* at 1341 (quoting *United States v. Cooper, supra* at 652).

**4.** Our conclusion in this regard is buttressed by our view of Congress' intent in enacting section

215 and section 656. As we noted in *Twiford,* there is no indication Congress intended mutually exclusive prosecutions under the two sections:

> Indeed in 1948 Congress revised the body of federal criminal law. Congressional review was exhaustive and although "[r]evision, as distinguished from codification, meant ... reconciliation of conflicting laws, omission of superseded sections, and consolidation of similar provisions," section 215 ... and section 656 were preserved as separate sections without an express limitation on each other.

600 F.2d at 1342.

dence relating to conspiracy. His primary contention is that the trial judge erroneously admitted hearsay evidence relating to the conspiracy under Fed.R.Evid. 801(d)(2)(E) [5] without having made an initial finding based upon independent evidence that a conspiracy existed and that the statements were made in furtherance of the conspiracy.

Harenberg relies upon our decision in *United States v. Petersen,* 611 F.2d 1313 (10th Cir.1979). We find this reliance misplaced. In *Petersen,* we adopted the procedures for admitting such evidence set forth in *United States v. James,* 590 F.2d 575 (5th Cir.1979). The procedures provide "that it is *preferable, whenever possible,* to require the Government to first introduce independent proof of the conspiracy ... before admitting hearsay declarations of co-conspirators." *United States v. Petersen, supra* at 1330 (emphasis added). Where this procedure is not "reasonably practicable," however, we recognized that the court may admit the statements provisionally, subject to being "connected up" by subsequent independent evidence. *Id.*

 The record clearly shows that the trial judge understood and attempted to follow the procedures expressed in *Petersen.* He was plainly aware of the *Petersen* "preferred procedure" and abandoned this course only after having discussed the issue with counsel for both parties. The government argued that the preferred method could not be followed in this case because the trials of the alleged conspirators were severed, leaving each trial with "two absent conspirators" and consequent order-of-proof problems. The order of proof is within the discretion of the trial judge. *United States v. Kaatz,* 705 F.2d 1237, 1244 (10th Cir.1983). We cannot say that, under these circumstances, the judge abused his discretion by concluding that *Petersen's* preferred procedure need not be followed. Neither can we find error in his

subsequent finding that the government successfully "connected up" the conspiracy with sufficient independent evidence.

## IV.

### *Summary Witness*

Counts II, III, and IV of the Indictment charged Harenberg with willfully and knowingly making and subscribing a false income tax return in violation of 26 U.S.C. § 7206(1). As its last witness, the United States called IRS Revenue Agent B.W. Wilson as an expert on the preparation of income tax returns. Generally, Wilson testified about the different valid methods of preparing Harenberg's tax return, and, that according to each and every method illustrated, the amount of income reported by Harenberg was incorrect.

In arriving at this general conclusion, Wilson used a summary chart which listed the amounts allegedly received by Harenberg in the various loan transactions. Harenberg argues that the court allowed Wilson too much leeway in using this chart; he argues that Wilson used the chart not to summarize the evidence, but to evaluate it. Thus, Harenberg contends, the contents of the chart were overemphasized and "sear[ed] on the minds of the jurors the government's version of the facts." (Appellant's Brief at 20).

 Harenberg does not argue that the district court erred in admitting the summary chart into evidence. Clearly, the district judge did not abuse his discretion in allowing the chart, as it was very helpful in sorting out the numerous exhibits presented by the government and provided a foundation for agent Wilson's conclusions. We have approved the use of summaries in tax prosecutions on other occasions. *See United States v. Kaatz, supra* at 1245; *United States v. Behrens,* 689 F.2d 154, 161–62 (10th Cir.1982).

---

5. Fed.R.Evid. 801(d)(2)(E) excepts from the definition of hearsay, statements "by a co-conspirator of a party during the course and furtherance of the conspiracy."

Neither does Harenberg argue that the instructions given in regard to the summary were inadequate. Indeed, we have reviewed the instructions and found them suitably cautionary. The jury was warned that the summaries were not evidence, but were "argumentative tools which the Government contend[s] support its case." (Tr. I, 211, No. 23). Further, the jury was instructed that it was their duty "to determine whether the charts and summaries reflect the facts shown by the records, and to determine the weight, if any, to be given these charts and summaries." *Id.*

■ Harenberg essentially argues that the trial court abused its discretion in allowing agent Wilson to inflate unfairly the importance of the summary. We have reviewed the record and see absolutely no merit in this contention. Agent Wilson testified numerous times that his summary was based solely upon evidence properly adduced at trial. In addition, he was thoroughly voir-dired on the summary before it was admitted, and thoroughly cross-examined about his testimony after it was admitted. Finally, after reviewing Wilson's actual testimony we are unconvinced that his statements were "evaluative" in nature. In fact, Harenberg himself made but one objection on this ground at trial. We find no error connected with agent Wilson's testimony and his use of the summary charts.

## V.

### Other Evidentiary Matters

*Admitted Evidence:* Harenberg argues that various evidence was improperly admitted. First, he contends that Mr. Klein and Natalyn Kapnison were permitted to testify about matters that were hearsay not falling within the co-conspirator exception of Rule 801(d)(2)(E). Second, he argues that the government's injection of irrelevant evidence ("the Carlucci evidence") unfairly prejudiced him.

■ We are unconvinced that the district court abused its discretion on any of the above matters. As to Klein, we agree with the government that his testimony regarding Kapnison's statements fit within the co-conspirator exception of Rule 801(d)(2)(E). Kapnison's statements dealt directly with the manipulation of Klein, the exaction of a guarantee fee of $20,000 and three-quarters of Klein's company's stock, and the elevation of Kapnison, Bronstein, and Harenberg to the board of directors of Klein's company. Clearly, statements regarding these matters are "in furtherance of the conspiracy." Similarly, we have reviewed Natalyn Kapnison's testimony and find no indication that the court allowed her to testify to hearsay matters outside of the conspiracy. Notably, no objections were raised in this regard in the portions of the proceedings cited by Harenberg. In the absence of plain error, we will not consider issues raised for the first time on appeal. Fed.R.Crim.P. 52(b); *United States v. Guerrero*, 517 F.2d 528, 531 (10th Cir.1975); *United States v. Ray*, 488 F.2d 15 (10th Cir.1973).

The Carlucci transaction involved the transfer by Harenberg of large sums of money from Bronstein's office to the Bank in Clovis. This money purportedly belonged to one Frank Carlucci. Harenberg, at Bronstein's request, opened an account for Carlucci at the Bank, then later withdrew a portion of the money and delivered it to Bronstein. Harenberg had never met Carlucci until this second delivery.

On cross-examination, Harenberg initially denied having engaged in large cash transactions with Bronstein or Kapnison, and denied having ever deviated from good banking practices with the two men. The government then inquired about the Carlucci transaction, to which Harenberg objected, claiming evidence on the matter was irrelevant and unfairly prejudicial to him. The district court disagreed and allowed the government to proceed with a limited inquiry.

■ Fed.R.Evid. 404(b) prohibits the use of evidence of other "crimes, wrongs,

or acts ... to prove the character of a person in order to show that he acted in conformity therewith." This rule, however, allows such evidence to be used for other purposes—to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." We have noted that Rule 404(b) is not strictly exclusionary, but would allow the admission of "crimes, wrongs, or acts" *unless* the *only* purpose for their admission is to prove the criminal disposition of the defendant. *United States v. Nolan,* 551 F.2d 266, 271 (10th Cir.1977). Here, we are satisfied with the government's argument that there were proper purposes behind tendering the evidence; the evidence tended to show "[t]he methods by which the Bank's affairs were conducted ... [and] the locus of real management and control." (Appellee's Brief at 46). This evidence, in our view, tended to show "opportunity" or "plan" in accordance with Rule 404(b).

Having found a permissible purpose for the admission of the Carlucci evidence under Rule 404(b), we must still determine whether the trial judge erred in failing to exclude the evidence as unduly prejudicial under Fed.R.Evid. 403. In reviewing the district court's determination, we note that the weighing of the prejudicial effect against the probative value of evidence is a process within the discretion of the trial judge. *United States v. Nolan, supra* at 271. The judge's decision will be upheld unless there is a showing of abuse or manifest injustice. *Id.* Harenberg has made no such showing and, thus, the district court's decision must stand.

*Excluded Evidence:* Harenberg next argues that certain evidence favorable to his defense was erroneously excluded by the trial court. This evidence consisted of the following: (1) the grand jury testimony of one Mr. Hooe; (2) the depositions of co-defendants Kapnison and Bronstein taken in an unrelated civil action; and (3) Natalyn Kapnison's secret recording on tape of conversations with her husband. We hold that these items were properly excluded.

1. *Hooe Testimony:* Mr. Hooe was the attorney of Mr. Klein, one of the borrowers involved in the PIT transaction. Hooe testified before a grand jury and, according to Harenberg, his statements contradicted various statements made by Klein at trial. Because Hooe could not be located during the trial, Harenberg wished to introduce Hooe's grand jury testimony as a means of diminishing the credibility of Mr. Klein.

The district court, however, refused to admit this testimony. Contrary to Harenberg's contention, we hold that this decision was proper. As the Supreme Court has noted, when a hearsay declarant is not present for cross-examination, his statement is admissible only if it bears adequate "indicia of reliability." *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1979). This reliability may be inferred when the statement falls within a firmly-rooted hearsay exception. *Id.* Otherwise, "the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Id.*

Because Hooe's grand jury testimony fell within no recognized hearsay exception, it was not admissible unless Harenberg made a "particularized showing of its trustworthiness." We have examined the record and do not find that such a demonstration was made. We have no reason to hold that the trial judge abused his discretionary function in weighing the competing interests surrounding Hooe's testimony and concluding that, on balance, the testimony should be excluded.

Our conclusion is buttressed by the cumulative nature of Hooe's grand jury testimony. The primary object of the testimony would have been to discredit Klein by pointing out inconsistencies in his statements made at trial. This end, however, was at least partially met during cross-examination as Harenberg questioned Klein

numerous times about Hooe's inconsistent grand jury statements. The jury was made aware of Hooe's version of many of the facts in issue. Harenberg was not materially prejudiced by the exclusion of the testimony.

2. *Kapnison and Bronstein Depositions:* Kapnison, Bronstein, and Harenberg, the three co-defendants in this prosecution, were third-party defendants in an action originally brought against a borrower by the First National Bank of Clovis. Harenberg proposed to offer in this criminal proceeding the depositions of Kapnison and Bronstein taken in the aforementioned civil matter. The trial court, however, properly rejected this proffer.

 Fed.R.Evid. 804(b)(1) excepts such depositions from the hearsay ban provided that they were "taken ... in the course of another proceeding ... if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Clearly, the United States had no opportunity to examine Kapnison or Harenberg during the course of the civil depositions. Thus, the depositions were properly excluded.

 3. *Natalyn Kapnison's Secret Recordings:* The district court also excluded various tape recordings made secretly by Natalyn Kapnison of conversations she had with her husband. Harenberg sought to question Ms. Kapnison about these recordings, presumably to reduce her credibility by showing prejudice or bias. We agree with the district court, however, that Ms. Kapnison's recording of her husband was irrelevant in Harenberg's trial. Such a recording in no way tends to show that she was biased or prejudiced against Harenberg, and to have allowed questioning on this matter would have merely confused the issues.

 *Sufficiency of the Evidence:* Harenberg next argues that there was no evidence linking him with any of the fees received in the Flagan, RHS, and Homaby Bay transactions. We disagree. There is direct evidence in the record establishing Harenberg's role in each of the transactions as banker and his reception of the Homaby Bay and RHS kickbacks. Further, there is significant circumstantial evidence linking him with kickbacks in the Flagan loan. As we have stated before, we do not weigh the evidence or determine the credibility of witnesses. *United States v. Kaatz, supra* at 1245. "The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). *See also United States v. Samara,* 643 F.2d 701, 704 (10th Cir.1981).

## VI.

### *Prosecutor's Closing Remarks*

As his final argument, Harenberg contends that the closing arguments of the prosecutor were improper and warrant a new trial. The prosecutor's comments included comparisons between Harenberg's conduct and actions where guns are used, and also contained "assurances" of the independence of the government's witnesses.

 Harenberg's argument in this regard is weakened by his failure to object at trial to these comments. Owing to this omission, the prosecutor's remarks are not now reviewable unless they may be deemed "plain error." *United States v. Guerrero, supra* at 531; Fed.R.Crim.P. 52(b). In our view, the prosecutor's comments did not rise to this level. They did not, for example, constitute "emphatic and personalized vouching" for the integrity of the government's witnesses as we found in *United States v. Ludwig,* 508 F.2d 140, 143 (10th Cir.1974), nor did they contain "contrived statements of facts" as we found in *United States v. Rios,* 611 F.2d 1335, 1343–44 (10th Cir.1979). Viewed as a whole, we hold that

the government's closing argument "stuck to the facts" and did not divert the jury from its duty to decide the case based on the evidence. *See* American Bar Association Standards, *The Prosecution Function* § 5.8.

In conclusion, we are convinced that Harenberg received a fair trial and that the jury's verdict was proper in all respects.

AFFIRMED.