21 F.3d 1122
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Robert W. GARRETT, Defendant-Appellant.
 No. 93-6148.
 United States Court of Appeals, Tenth Circuit.
 March 8, 1994.
 
 1
 Before MOORE, Circuit Judge, McWILLIAMS, Senior Circuit Judge and ROGERS, District Judge.*
 
 
 2
 ORDER AND JUDGMENT**
 
 
 3
 ROGERS, Senior District Judge.
 
 
 4
 Robert W. Garrett appeals from his conviction on one count of misapplication of bank funds in violation of 18 U.S.C. Sec. 656 and from his sentence on one count of attempting to cause the failure to file a cash transaction report required for filing under the law, a violation of 31 U.S.C. Sec. 5324(a)(1). Garrett's arguments against his conviction involve the application of 18 U.S.C. Sec. 656. Garrett's arguments against his sentence involve the application of U.S.S.G. Sec. 2S1.3. We exercise jurisdiction under 28 U.S.C. Sec. 1291 and 18 U.S.C. Sec. 3742.
 
 I. 18 U.S.C. Sec. 656
 
 5
 Garrett's first argument on appeal is that the trial court erred in not sustaining Garrett's motion for judgment of acquittal as to the count which charged him with misapplication of bank funds. We apply de novo review to any legal issues raised by Garrett's motion; we consider the sufficiency of the evidence in a light most favorable to the government. U.S. v. Davis, 965 F.2d 804, 809 (10th Cir.1992), cert. denied, 113 S.Ct. 1255 (1993). If the jury's verdict is consistent with the law and supported by substantial evidence, then the denial of the motion for acquittal must be affirmed. Id.
 
 
 6
 The essential elements of the offense of misapplication of bank funds are: "(1) the willful (2) misapplication (3) of money, funds or credits (4) of a federally protected bank." U.S. v. Harenberg, 732 F.2d 1507, 1511 (10th Cir.1984).
 
 
 7
 The Indictment in this case charged that on or about December 29, 1988, Garrett, as an officer of the Charter National Bank, knowingly and willfully misapplied approximately $10,000.00 of the bank's monies by causing that sum to be advanced on a loan to Southwest Assets, Inc. when in fact, as he knew, the loan funds were to be used for his benefit.
 
 
 8
 The evidence in this case, viewed in a light most favorable to the government, established that Robert W. Garrett was a loan officer at Charter National Bank. Garrett left a job at another bank to start working at Charter National Bank. About six months later, John Stone, a friend of Garrett's, brought his banking business to Charter National Bank from Garrett's old bank. Stone was the owner and operator of Southwest Assets, Inc., a corporation which bought and sold aircraft and aircraft parts. Southwest Assets had a commercial account at Charter Bank and a revolving line of credit of $50,000.00 to buy parts and for general operating expenses. With the line of credit, Stone, on behalf of Southwest Assets, could borrow any sum with no questions asked, as long as the total amount borrowed did not exceed $50,000.00.
 
 
 9
 On December 29, 1988, Garrett called Stone and asked for a meeting outside of the bank. At the meeting, Garrett asked Stone to lend him $10,000.00 which Garrett would use to buy bank stock. Stone felt uncomfortable about loaning Garrett the money. He told Garrett that he only had $5,000.00 in the Southwest account. (This proved to be incorrect.) Garrett responded, "Well, you could draw down against your line for whatever else you needed." (Tr. 77.) Stone acceded to Garrett's request. Stone testified at trial:
 
 
 10
 It was understood that [Garrett] was going to advance me $10,000 against my line.
 
 
 11
 Q. Why would he do that?
 
 
 12
 A. As I told you before, when we talked about the loan, and I told him I only had 5,000 in my account, he said--you know, asked me how much I owed on my line, and said, "Well, you could draw down against your line for whatever else you needed." And so--
 
 
 13
 Q. So in return--I'm sorry, go ahead.
 
 
 14
 A. And so, you know, once I had given him the $10,000, it was obvious that I was going to need more money if I was going to go ahead and buy an airplane, or whatever I was going to do with the money.
 
 
 15
 Q. So the $10,000 advance on the line of credit was connected back to the loan that you made him in that same amount so that he could buy stock in Charter Bank.
 
 
 16
 A. That's correct.
 
 
 17
 Q. That increases your line of credit by $10,000, and that just means that you've got to take longer to pay that off, come up with more money to pay it off. Did you want to increase your line of credit at that time?
 
 
 18
 A. Well, no, of course I didn't. Now, I would say one thing, it didn't increase my line of credit, it just increased my draw against my line of credit.
 
 
 19
 Q. It also increased the amount that you had to repay the bank.
 
 
 20
 A. Yeah, that I had to repay the bank.
 
 
 21
 (Tr. 77-78.)
 
 
 22
 On the same day that Garrett asked him for the loan, Stone withdrew $4,500.00 from the commercial account of Southwest Assets. He gave $4,000.00 of that to Garrett. Then he spoke with a friend, Mr. Mark Sullivant, and borrowed $6,000.00 from him. Sullivant tried to deliver this money to Garrett on December 29th but was unsuccessful. Sullivant transmitted the money to Stone, who delivered the $6,000.00 to Garrett on December 30th. When the president of the bank, Gene Wheeler, saw the money on Garrett's desk, Garrett led Wheeler to believe he received the funds from his father.
 
 
 23
 On December 30th, Stone made a $5,000.00 draw on Southwest Assets' line of credit. He paid $4,275.00 of that to Mark Sullivant as partial repayment of his loan. On January 5, 1989, Stone made a second $5,000.00 draw on Southwest Assets' line of credit. The bank records are unclear as to who approved the loan advance on December 30, 1988. Wheeler approved the loan advance of January 5, 1989. Apparently, these approvals were perfunctory.
 
 
 24
 In the motion for acquittal, Garrett argued that the government had not established that bank funds had been received by him. Garrett also argued that the government failed to prove an intent to defraud the bank. On appeal, Garrett has expanded upon these arguments to assert that the record does not establish that he misapplied bank funds. We shall address these arguments in order.
 
 
 25
 Bank Funds A conviction under 18 U.S.C. Sec. 656 does not require that a bank officer actually receive funds from his bank. See, e.g., U.S. v. Brookshire, 514 F.2d 786 (10th Cir.1975) (conviction of bank president who made interbank deposit in order to receive loan from another bank on favorable terms). This court discussed the elements of misapplication of bank funds in a case arising under 18 U.S.C. Sec. 657, a parallel statute to Sec. 656 involving institutions insured by the FSLIC:
 
 
 26
 Misapplication may occur when an officer, director, employee or other person subject to the statute knowingly lends money to a sham borrower or causes all or part of the loan to be made for his own benefit while concealing his interest from the bank. [ United States v. Twiford, 600 F.2d 1339, 1341-42 (10th Cir.1979).] Misapplication of funds " 'occurs when funds are distributed under a record which misrepresents the true state of the record with the intent that bank officials, bank examiners, or the Federal Deposit Insurance Corporation will be deceived.' " Id. at 1341 (quoting United States v. Kennedy, 564 F.2d 1329, 1339 (9th Cir.1977), cert. denied, 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978)). Thus, when a person within the ambit of Sec. 657 receives material benefits of loans without disclosing this fact, misapplication has occurred. See United States v. Cooper, 464 F.2d 648, 651-52 (10th Cir.1972) (construing 18 U.S.C. Sec. 656).
 
 
 27
 Davis, 953 F.2d at 1493. This court further:
 
 
 28
 declined to apply the [misapplication] statute solely on "the flow of funds and the consequent changes in the incidence of ownership." ... Rather, we look at the substance of the transactions, even if multiple entities are involved.
 
 
 29
 Id. at 1494 ( quoting United States v. Harenberg, supra, 732 F.2d at 1511).
 
 
 30
 In this case, the evidence established that without disclosing the fact to bank authorities, Garrett received the material benefit of the line of credit the bank extended to Southwest Assets, Inc. for its operating expenses. This line of credit was used, at the suggestion and understanding of Garrett, to cover the loan he received from John Stone. Because Garrett received the benefit of funds which were extended by the bank on the credit line of Southwest Assets, we believe a sufficient link to bank funds was established in this case.
 
 
 31
 Intent to defraud "Intent to defraud" is not an explicit requirement of Sec. 656. This court has held that "evidence of an 'intent to deceive' supplied the necessary proof of criminal intent required by section 656." Harenberg, 732 F.2d at 1511-12. Evidence demonstrating that a bank officer procured the assistance of a bank customer in obtaining bank funds for the bank officer's use provides sufficient proof for a jury to decide that a loan transaction was undertaken with the intent of deceiving the bank or its officers or examiners, even if the bank customer was capable of repaying the loan. United States v. Krepps, 605 F.2d 101, 106 (3rd Cir.1979). We believe sufficient evidence of such an intent to deceive is present in the record. See also United States v. Morales, 978 F.2d 650, 653 (11th Cir.1992) (intent to defraud is established by proof that defendant knowingly participated in a deceptive transaction); United States v. Crabtree, 979 F.2d 1261, 1267 (7th Cir.1992), cert. denied, 114 S.Ct. 216 (1993) (the intent required for a misapplication conviction is minimal).
 
 
 32
 Misapplication Garrett's final argument regarding his conviction for misapplication of bank funds is based on the absence of proof that he took any direct action as a bank officer to authorize any draw upon Southwest Assets' line of credit after he asked John Stone to loan him $10,000.00. This argument meshes with Garrett's depiction of this matter as a friend, not a bank officer, asking another friend for a loan. Garrett contends this failure of proof is critical in light of the holding in United States v. McCright, 821 F.2d 226 (5th Cir.1987), cert. denied, 484 U.S. 1005 (1988). In McCright, the defendant bank officer was also a shareholder in a corporation which received a loan in 1977 from defendant's bank to build a country club. The defendant argued for this loan although he abstained from voting for or against it. Four years later, the corporation sought a second loan from defendant's bank in order to buy bank shares owned by defendant and others. This second loan was also granted and became the subject of defendant's indictment under Sec. 656. However, the government presented no evidence that defendant authorized, advocated or influenced the decision to make the second loan. The Fifth Circuit reversed the defendant's conviction, finding that defendant's connection to the first loan and his failure to disclose his interest in the second loan were not sufficient to establish his misapplication of bank funds. The Fifth Circuit stated: "Although we do not believe McCright had to be the lending agent in order to misapply bank funds in contravention of section 656, the statute does contemplate some causal connection between the defendant's actions as an officer or director of the bank and the making of the loan." Id. at 230.
 
 
 33
 We believe there is evidence of such a connection in this case. The evidence in the record substantially supports the conclusion that, because of his position as a bank officer, Garrett was familiar with Southwest Assets' line of credit at his bank and John Stone's access to it. He knew that the line of credit could accommodate his request for $10,000.00 and that Stone could reach the money with no questions asked. Finally, Garrett initiated and influenced the loan discussions and he reached an understanding with Stone that Stone could draw on the line of credit to cover the $10,000.00 loan to Garrett.
 
 
 34
 Under these circumstances, we believe the trial court was correct in denying the motion for acquittal. See U.S. v. Davis, supra (shareholder of bank, who also acted as a financial consultant, violated Sec. 657 by advising bank president to purchase securities, when a portion of the purchase price was funneled back to the defendant through the creation of a financial services corporation); United States v. McKinney, 822 F.2d 946, 949 (10th Cir.1987) (defendant, chairman of bank board, violated Sec. 656 by directing his secretary, as sole trustee of his children's trust, to establish a line of credit at the bank and then directed her to borrow on the line of credit for money to refurbish defendant's yacht); see also United States v. Dreitzler, 577 F.2d 539, 547 (9th Cir.1978), cert. denied, 440 U.S. 921 (1979) (violation established if misapplication occurred because defendant was connected in some capacity with a bank so that he gained access to bank funds--action in official capacity as bank officer is not required); but see United States v. Kington, 875 F.2d 1091, 1102 (5th Cir.1989) (bank officers' advocacy of stock sales, from which they received commissions, did not violate Sec. 656 when loans to finance the sales were made through previously established lines of credit which the borrowers could have accessed without the authorization of defendants).
 
 II. U.S.S.G. Sec. 2S1.3
 
 35
 Garrett's second major argument on appeal addresses his sentence for attempting to cause the failure to file a currency transaction report required under 31 U.S.C. Sec. 5313(a). Garrett's sentence for this conviction required an application of U.S.S.G. Sec. 2S1.3, which at the time of sentencing provided in pertinent part:
 
 
 36
 Sec. 2S1.3 Failure to Report Monetary Transactions; Structuring Transactions to Evade Reporting Requirements
 
 
 37
 (a) Base Offense Level:
 
 
 38
 (1) 13, if the defendant:
 
 
 39
 (A) structured transactions to evade reporting requirements; or
 
 
 40
 (B) knowingly filed, or caused another to file, a report containing materially false statements; or
 
 
 41
 (2) 5, otherwise.
 
 
 42
 (b) Specific Offense Characteristics
 
 
 43
 (1) If the defendant knew or believed that the funds were criminally derived property, increase by 4 levels. If the resulting offense level is less than level 13, increase to level 13.
 
 
 44
 (2) If the base offense level is from (a)(1) above and the value of the funds exceeded $100,000, increase the offense level as specified in Sec. 2S1.1(b)(2).
 
 
 45
 United States Sentencing Commission, Guidelines Manual, Sec. 2S1.3 (Nov. 1992).
 
 
 46
 The trial judge found that Garrett's conduct was tantamount to structuring a transaction to evade reporting requirements and, therefore, applied a base offense level of 13 in determining Garrett's sentence for the violation of 31 U.S.C. Sec. 5324(a)(1).
 
 
 47
 Garrett has made two arguments against the assignment of a base offense level of 13 to his conviction. First, Garrett argues for the application of the 1988 edition of the sentencing guidelines. Specifically, he contends that the court should have applied the 1988 revised edition commentary to U.S.S.G. Sec. 2S1.3. This edition of the sentencing guidelines was in effect at the time of the commission of the crime. The commentary reads in part:
 
 
 48
 The base offense level is set at 13 for the great majority of cases. However, the base offense level is set at 5 for those cases in which these offenses may be committed with innocent motives and the defendant reasonably believed that the funds were from legitimate sources. The higher base offense level applies in all other cases. The offense level is increased by 5 levels if the defendant knew that the funds were criminally derived.
 
 
 49
 United States Sentencing Commission, Guidelines Manual, comment. (backg'd) (Oct. 1987).
 
 
 50
 Garrett's second argument against his sentence asks for the application of the 1993 revised edition of the sentencing guidelines. Specifically, he requests this court to apply a new amendment (Amendment No. 490) to U.S.S.G. Sec. 2S1.3 that has been implemented since defendant was sentenced in this case. Effective November 1, 1993, Sec. 2S1.3 had been changed to read as follows:
 
 
 51
 Sec. 2S1.3. Structuring Transactions to Evade Reporting Requirements; Failure to Report Cash or Monetary Transactions; Failure to File Currency and Monetary Instrument Report; Knowingly Filing False Reports
 
 
 52
 (a) Base Offense Level: 6 plus the number of offense levels from the table in Sec. 2F1.1 (Fraud and Deceit) corresponding to the value of the funds.
 
 
 53
 (b) Specific Offense Characteristics:
 
 
 54
 (1) If the defendant knew or believed that the funds were proceeds of unlawful activity, or were intended to promote unlawful activity, increase by 2 levels.
 
 
 55
 (2) If (A) subsection (b)(1) does not apply; (B) the defendant did not act with reckless disregard of the source of the funds; (C) the funds were the proceeds of lawful activity; and (D) the funds were to be used for a lawful purpose, decrease the offense level to level 6.
 
 
 56
 (c) Cross Reference
 
 
 57
 (1) If the offense was committed for the purposes of violating the Internal Revenue laws, apply the most appropriate guideline from Chapter Two, Part T (Offenses Involving Taxation) if the resulting offense level is greater than that determined above.
 
 
 58
 United States Sentencing Commission, Guidelines Manual, Sec. 2S1.3 (Nov. 1993).
 
 
 59
 We reject Garrett's argument for the application of the 1988 edition of the sentencing guidelines for the following reasons. First, the general rule is that courts must apply the sentencing guidelines in effect at the time of sentencing. United States v. Saucedo, 950 F.2d 1508, 1513 (10th Cir.1991). Notwithstanding this rule, Garrett, who also cites the Saucedo case, asserts that the ex post facto clause requires the court to apply the guidelines and commentary in effect at the time of the commission of the crime, if the subsequent change in the guidelines or commentary is to the disadvantage of the defendant. However, the Saucedo case notes that clarifying amendments to the sentencing guidelines frequently are considered expressive of the Sentencing Commission's intent regarding the pre-amendment guideline and, therefore, do not present an ex post facto issue. Id. at 1514. We believe that is the situation regarding the 1989 amendment to U.S.S.G. Sec. 2S1.3 (Amendment No. 218) which deleted the commentary relied upon by Garrett. United States Sentencing Commission, Guidelines Manual, App. C, p 218, at 96 (Nov. 1993).
 
 
 60
 But, even if the 1988 commentary to U.S.S.G. Sec. 2S1.3 was applied in this case, we do not believe Garrett's base offense level should be reduced from 13. The commentary states that the base offense level would be 5 instead of 13 if the offense was committed "with innocent motives and the defendant reasonably believed that the funds were from legitimate sources." This standard is not met. The evidence established that Garrett attempted to avoid the filing of a required currency transaction report at the request of a bank customer who wished to avoid the scrutiny of the Internal Revenue Service, when Garrett was aware that it was a reportable transaction. An intention to deprive the government of information to which it is entitled by law is not an innocent motivation. Therefore, resort to the 1988 edition of the sentencing guidelines would not reduce the base offense level for Garrett's conviction for attempting to prevent the report of a currency transaction.
 
 
 61
 Garrett's second and last argument regarding his sentence under U.S.S.G. Sec. 2S1.3 makes reference to the change in this section of the sentencing guidelines effective November 1, 1993. Applying this new version of the guidelines, it is possible that Garrett's base offense level on the currency report conviction could be reduced from 13 to 6. The sentencing guidelines provide that the most recent amendment to U.S.S.G. Sec. 2S1.3 (Amendment No. 490) may be applied retroactively. U.S.S.G. Sec. 1B1.10. Retroactive application is not required. Instead, the sentencing court has the discretion to so apply the amendment to the guidelines. Accordingly, the court shall remand the case to the district court in order to allow that court to consider whether to apply the amendment to U.S.S.G. Sec. 2S1.3 to reduce Garrett's sentence. See U.S. v. Coohey, 11 F.3d 97, 101 (8th Cir.1993).
 
 III. Conclusion
 
 62
 In conclusion, Garrett's conviction for misapplication of bank funds is affirmed. Garrett's sentence for attempting to cause the failure to file a currency transaction report is affirmed. We remand this case to the district court, however, to consider whether Garrett's sentence should be modified in light of the recent amendment to U.S.S.G. Sec. 2S1.3.
 
 
 
 *
 Honorable Richard D. Rogers, Senior District Judge, United States District Court for the District of Kansas, sitting by designation
 
 
 **
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470